Lakamore, Judge,
delivered the opinion of the court:
The plaintiffs, owners of several tracts of land and improvements near the City of Albany, Georgia, sue for the *442 value of an interest in said properties, allegedly taken by defendant by operating aircraft at Turner Air Force Base.
The real estate owned by plaintiffs was acquired either by purchase or inheritance at various times during the period 1923 to 1946 and is located just to the southwest of Turner Air Force Base.
Turner Air Force Base was activated by defendant on May 15, 1941, and was used throughout World War II for preflight training of aviation cadets and for training pilots for propeller-driven fighter and bomber aircraft. Until the cessation of hostilities, many different types of aircraft were used for training, including the propeller-driven B-25 medium bomber. During this period of time, B-25s made numerous flights at elevations as low as approximately 250 to 300 feet over tall the plaintiffs’ properties, and on occasion such flights would be as low as approximately 100 to 150 feet over such properties. These planes, including the B-25 bombers used at the Base commencing in 1943, were noisy but were not so obnoxious as to be intolerable to plaintiffs.
On September 1, 1947, Turner Field was reactivated and transferred to the Tactical Air Command. In January 1948 the Field was redesignated Turner Air Force Base. Shortly after December 1, 1948, the fighter group operating from said Base was equipped with P-51 single engine, propeller-driven aircraft. In September 1948, some F-84C single engine, jet-propelled fighter planes were assigned to the Base.
Thereafter, different types of jet-propelled aircraft were assigned to the Base as they were developed. An increasing number of flights occurred in the years following, when jet aircraft commenced regular low flights over the properties.
It is the government’s position that in the present case the plaintiff’s cause of action accrued in 1941, and certainly no later than 1948 or early 1949, when F-84 aircraft commenced full operations and started to make low and frequent flights over the premises, and this suit is barred by the statute of limitations, 28 U.S.C. § 2501.
The basic issue in this case, therefore, is essentially factual; i.e., when did the flights over plaintiffs’ land amount to a taking by the defendant under the standard established by the Supreme Court in United States v. Causby, 328 U.S. 256.
*443 This standard is that when flights over private lands constitute a direct and immediate interference with the enjoyment and use of the land by plaintiffs, there is a compensable taking under the Fifth Amendment.
Turning then to the facts of this case — it is quite evident that, while there was some noise and inconvenience to plaintiffs from the time the flights commenced in 1941, it was not so obnoxious as to be intolerable to plaintiffs. Even upon reactivation of the Field in 1947, while the use of P-51s and later the single engine jet T-33s, F-80s, F-84Cs, F-84Es, and F~84Gs, created greater noise and were still more annoying than the planes previously used, the noise was still not intolerable to plaintiffs and their families.
From 1947 to approximately the summer of 1955, the effect of the flights was not such as to interfere substantially with the use of plaintiffs’ properties as residential properties. However, the value of plaintiffs’ properties was diminished by the increased noise and nuisance of the newer and more powerful types of jet planes introduced at the Base in the latter part of 1954 (principally the F-84Fs, with their terrifyingly loud, shrill noise), the increased flight activity at the Base commencing in 1955, and the consequent more frequent low flights over the properties, and finally and more dramatically, by a later described plane crash in August 1955, following which the usual forms of YA, FELA, and conventional financing for residential properties became unobtainable with respect to transactions in properties located in the approach zones, as were plaintiffs’ properties. After August 1955, the marketability of such properties was seriously affected adversely by such financing restrictions. The introduction of the very large and even noisier eight engine B-52 jet bombers in 1959 and their frequent low flights over plaintiffs’ properties made such properties even less desirable as residential property and further reduced their market value.
There have been some differences in the flight pattern since runway No. 2 was opened in 1959, as the planes now come more directly over the houses in the Baker Heights subdivision and at lower altitudes. Baker Heights subdivision was laid out by plaintiffs’ Bertha Mock Davis, Stella Mock *444 Hunter, Kate Mock Bacon, and Alma Mock Hilsman prior to the arrival of the F-84Fs in 1954. Generally, however, there has been no substantial difference in the pattern of flights over plaintiffs’ properties since the commencement of operations on enlarged runway No. 2 in 1959.
It was not until late in 1954 or early in 1955 when the F-84F, a swept-wing aircraft, was introduced to the Base that the noise became intolerable to plaintiffs. The noise created by the F-84F was different from the previous aircraft used in that it emitted a shrill, high-pitched, intense noise, terrifying to plaintiffs. Furthermore, a number of KB-29s were brought to the Base at the same time and they also made a very loud, and what was to plaintiffs, terrifying noise as they flew over plaintiffs’ properties. The F-100s, a single engine jet which replaced the F-84s, were just as noisy, particularly when the afterburner was turned on. The eight engine B-52 jet bombers in use at the Base since July 1959 are the noisiest of all the planes which have operated from the Base.
The B-52s make an exceptionally loud, screaming, roaring noise. The noise of the F-100 with afterburner operating is also extremely intense at the altitudes at which it flies over the properties herein involved. The houses tremble and the windows rattle. Sleep is not only disturbed by the noise, but at night the whole area is brightly illuminated by the landing lights of the incoming planes. In late 1958, when the mission of Turner Air Force Base was changed from that of a fighter command to that of a bomber command and the B-52 eight engine bombers were subsequently assigned to the Base, plaintiffs justifiably became more fearful of living in the approach zones of the runways.
Added to the noise created by the planes used after late 1954 and early 1955, on August 12, 1955, an F-84F crashed within 200 to 250 feet of the house of plaintiff L. Eugene Mock II, and in close proximity of the homes of the other plaintiffs. The plane sheared off the top of the house, setting the house on fire, and completely demolished a 2-story garage apartment killing two people. This plane crash coincided approximately with the increase in noise because of the newer planes being introduced at the Base.
*445 Two property owners in tbe subdivision have been trying without success to sell their property. Several owners in this subdivision have sold their houses but were not able to realize anything on their equities.
Thus it is clear that the use by plaintiffs of their properties was not seriously interfered with until at least late in 1954 and that plaintiffs’ cause of action accrued at that time. The petition in this case was filed July 25,1958, and consequently is not barred by the statute of limitations, supra. See Davis v. United States, this day decided ante, p. 418; 295 F. 2d 931.
The parties have stipulated and agreed that in the event the court should find that the action of the defendant in operating aircraft at Turner Air Force Base constituted the taking of an interest in plaintiffs’ properties, or any of them, then the fair market value as of the date of such taking of the interests so taken, as to each parcel, shall be as follows:
1. Kate Mock Bacon_ $5, 000
2. Bertha Mock Davis, Stella Mock Hunter, Kate Mock Bacon and Alma Mock Hilsman, a partnership doing business as Baker Heights:
As to Tract A_ $2, 000
As to Tract B_ 750
As to Tract O_ 22,250
As to Tract D_ 2, 500
Total for Baker Heights_ 28, 000
3. Stella Mock Hunter_ 2,000
4. J. W. Mock
As to Tract A_ $1, 500
As to Tract B_ 8, 000
As to Tract O_ 750
As to Tract D_ 2, 750
Total for J. W. Mock_ 13, 000
5. J. W. Mock, Jr_ 4, 000
6. L. Eugene Mock, Sr_ 3,500
7. L. Eugene Mock, II_ 4, 500
It is concluded, therefore, that the flights of F-84Fs, KB-29s and B-52s so substantially interfered with plaintiffs’ use and enjoyment of their properties as to constitute a taking under the Fifth Amendment to the Constitution and plain-iffs therefore are entitled to recover, and judgment will be entered against defendant in the above amounts, together *446 with interest thereon, as a part of just compensation, at the rate of four percent per annum from August 12,1955 to date of payment.[1]
Plaintiffs will execute and deliver to defendant deeds describing and conveying the interests so taken, in conformity with this opinion.
It is so ordered.
Fahy, Circuit Judge, sitting by designation; Dureee, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur.
EINDINGS OE EACT
The court, having considered the evidence, the report of Trial Commissioner Saul Richard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs are all citizens of the United States and residents of the State of Georgia. They are and at all times pertinent hereto were the owners of various properties located near the city of Albany in Dougherty County, Georgia, and in the vicinity of Turner Air Force Base (hereinafter sometimes referred to as the “Base”). Their respective properties, referred to as “tracts”, are as follows:
Tract 1 is a house and lot owned by plaintiff Kate Mock Bacon (plaintiff No. 1), wife of James L. Bacon, Sr. Mrs. Bacon purchased the lot in 1946 and built a two-bedroom asbestos siding house with two tile baths, a two-car garage and fencing, and planted shrubbery. She and her husband lived in this house from 1946 to 1956, when they moved away. However, the house was rented within 30 days after they moved. It is now occupied by Mrs. Bacon’s brother, J. W. Mock, who is also a plaintiff herein (plaintiff No. 4).
Tract 2, which is divided into four parts, is owned by plaintiffs Bertha Mock Davis, Stella Mock Hunter, Kate Mock Bacon, and Alma Mock Hilsman, a partnership doing business as Baker Heights (designated in the petition as plaintiff No. 2), having been acquired by them by inheritance in 1933. Each owns an undivided one-fourth interest in the tract. Tract 2-A is an unimproved parcel of land containing 21.58 *447 acres which these plaintiffs planned to subdivide and develop after the lots in tract 2-C had been sold. Tract 2-B, containing 2.9 acres, more or less, and tract 2-1), containing 9.36 acres, are unimproved land being held for future commercial development. Tract 2-C consists of 39 lots remaining unsold in a subdivision, called Baker Heights, which was laid out in 1954 by these plaintiffs, who brought in water to the property and provided paved streets. Prior to 1955, these plaintiffs sold 21 lots in the subdivision to speculative builders.
Tract 3 is an unimproved parcel of land consisting of 10.5 acres owned by plaintiff Stella Mock Hunter (plaintiff No. 3) since 1933. It adjoins tract 2-A.
Tract 4, owned by plaintiff J. W. Mock (plaintiff No. 4), consists of four separate parcels which were acquired by him in 1930 and 1933. Tracts 4-A and 4 — D are unimproved. Tract 4-B consists of this plaintiff’s original home, built around 1912, and the 18 lots remaining unsold in block A of Woodland Acres Subdivision. Tract 4-C is made up of the two lots remaining unsold in block B of said subdivision.
Tract 5 is one of the lots in block A of the Woodland Acres Subdivision. Plaintiff J. W. Mock, Jr. (plaintiff No. 5) purchased it from his father (plaintiff No. 4) in 1944, and in 1945 built a two-story, three-bedroom house on it, where he lived with his family until 1955, when he moved in with his father next door following the death of his mother. After remaining vacant for 2 months, the house was rented to military personnel.
Tract 6, consisting of 5.71 acres, is improved by a house with six rooms and a large upstairs where the owner, L. Eugene Mock, Sr. (plaintiff No. 6), has lived since 1924. He acquired the property in 1923 and has owned it continuously since that time. There is also on the property a garage and garage apartment built about 1934.
Tract 7 is another of the lots in block A, Woodland Acres Subdivision. The owner, L. Eugene Mock, II (plaintiff No. 7), bought it in 1946 and immediately built a frame asbestos siding five-room house with bath. He and his family have lived in this house since June 1947.
*448 2. (a) Tbe Base was originally established by defendant for use in a training program and was activated on May 15, 1941, as the Air Corps Advanced Flying School (Twin Engine), Albany, Georgia. On July 21, 1941, it was officially designated as Turner Field. Until the entry of the United States into World War II it was used by the Air Corps for navigation training and for advanced training of pilots in two-engine aircraft. During the war it was used for the training of pilots for propeller-driven fighter and bomber aircraft. A large school for the preflight training of aviation cadets was maintained, and after these cadets had received their primary flight instruction at other bases they returned to Turner Field for advanced flight training for such propeller-driven fighter and bomber aircraft. Until the cessation of hostilities, many different types of propeller-driven aircraft were used for training, including the B-25, a propeller-driven medium-bomber type of aircraft. The use of the B-25 in the advanced flight training was commenced in December 1943, and conversion to B-25s was completed by the fall of 1944. With the cessation of hostilities in the Pacific, the flight training program was cut back sharply, and the last class was graduated at the end of January 1946. An announcement was made early in February 1946 that Turner Field was to be inactivated. By March 1946 it was placed on a reduced-activity status, and on August 15, 1946, Turner Field was inactivated.
(b) Beginning in 1941, and until the Field was inactivated in 1946, the aircraft assigned to or visiting Turner Field, including the B-25s, made numerous flights to and from the southwest end of runway No. 1, which runway is hereinafter more particularly described. In making the flights, the takeoffs toward the southwest and the landings from such direction resulted in the planes flying frequently at elevations as low as approximately 250 to 300 feet over all of the plaintiffs’ properties. On occasion, such flights would be as low as approximately 100 to 150 feet over such properties.
3. On September 1,1947, Turner Field was reactivated and transferred to the Tactical Air Command. The 31st Fighter Group was stationed there and became the principal operational component of the 31st Fighter Wing, which was *449 activated in November 1947. In January 1948 Turner Field was redesignated Turner Air Force Base. Shortly after December 1, 1948, the 31st Fighter Wing was converted from the use of P-51 aircraft, which was a single engine, propeller-driven fighter, to F-84 type aircraft, which was a single engine, jet-propelled fighter. Some F-84s were assigned to the Base in September 1948, but in December 1948 the 31st Fighter Wing received a full complement of 75 F-84 aircraft. This consisted of three squadrons of 25 each. Full operation of these planes did not commence, however, until 1949. The first version of this aircraft delivered to the Base was the F-84C.
The F-84Cs made numerous takeoffs from and landings to the Base over plaintiffs’ properties during 1949 and 1950. These flights were frequently at elevations as low as approximately 250 to 300 feet over plaintiffs’ properties. On occasion, a flight would be as low as approximately 100-150 feet over the properties. Visiting or transient aircraft also flew in large numbers over plaintiffs’ properties. In July 1950 the Base was transferred to the Strategic Air Command (SAC). With this transfer, the 31st Fighter Wing, the principal tenant organization at the Base, was made a SAC unit, with a change of mission reflected by its redesignation as the 31st Fighter-Escort Wing. Later that year, the Wing, together with the F-84Cs, was sent to England. However, other units were activated from time to time and other jet aircraft, principally different versions of the F-84s, such as F-84Es and F-84Gs, were assigned to the Base, which continued to make similar flights over plaintiffs’ properties at similar elevations. At various times from 1951 through 1957, there was movement out from and into the Base as different units went on temporary duty assignments to Japan, Alaska, and the United Kingdom.
In the late fall of 1954, another model of the F-84, being the F-84F, a swept-wing type which was more powerful, was assigned to the Base, and became the principal type of F-84 aircraft flown there, replacing the F-84G model. However, most of the deliveries of the F-84Fs were made in the spring of 1955. At about the same time, a second fighter wing was activated and also equipped with F-84Fs, resulting *450 in increased flight activity at the Base. This aircraft also was flown over plaintiffs’ properties at approximately the same elevations set forth above, but with greater frequency, and more frequently at the 100-150-foot elevation than theretofore.
In 1956, F-100s, being another type of single-engine jet fighter, and B-57s, being twin-engine bombers, were assigned to and flown at the Base. After being reassigned to the Tactical Air Command for about a year, the Base was transferred again to the Strategic Air Command in late 1958, and its mission changed to heavy bombardment. About July 1959, a number of B-52s was assigned to and began operating from the Base. The B-52 is an eight-engine jet bomber and is one of the largest jet aircraft now used by the Air Force. During this 1956-1959 period also, aircraft of the aforesaid types made numerous flights at similar low elevations over plaintiffs’ properties.
4. Of the two runways now on the Base, only one, called runway No. 1, was in existence in the first half of 1951. Up to that time there were other runways, since discontinued, running generally north and south, which propeller-driven aircraft often used. The location of these runways was such that flights taking off from or landing on them would not pass over any of plaintiffs’ properties. These discontinued runways were 5,000 to 6,000 feet long and were considered too small for jet aircraft, which therefore used runway No. 1. Kunway No. 1 was constructed originally to a length of approximately 7,575 feet during the initial airfield construction program from 1941 through 1943. In 1951 this runway, which lies in a northeast-southwest direction, was extended to the southwest for a distance of approximately 175 feet and to the northeast 1,350 feet, thus increasing its length to approximately 9,100 feet. The second runway, called runway No. 2, which is parallel to and southeast of runway No. 1, with a distance of 1,025 feet between their center lines, was completed in 1955. The southwest end of runway No. 1 extends about 330 feet farther to the southwest than does runway No. 2. As a part of additional construction begun in 1958, runway No. 2 was widened from its original width of 200 feet to 300 feet and a surfaced overrun *451 (nontraffic area) 1,000 feet long and 300 feet wide was added at the southwest end. Use of enlarged runway No. 2, which is approximately 10,000 feet in length, began July 7, 1959. Since that date runway No. 2 has been the primary runway of the Base, although runway No. 1 is still used occasionally by aircraft other than the B-52. Until 1959, the only runway in use for jet operations was runway No. 1
5. At the end of each runway is a clear zone 1,000 feet long and 1,500 feet wide. The end of the clear zone marks the beginning of the approach zone, an area 1,500 feet wide at its beginning and growing wider as it extends away from the clear zone, having the projected center line of the runway as its axis. The southwest ends of the runways are near enough to each other that the two clear zones overlap slightly. The two approach zones overlap to a much greater extent because they grow wider as the distance from the clear zone increases. Except for about two lots of tract 2-C, about one-third of tract 2-D, and a very small comer of tract 6, all of plaintiffs’ properties involved in this action lie within one or both of the approach zones southwest of the Base.
6. Within the approach zone of each runway is a so-called minimum safe glide angle to be observed by tire aircraft. This angle is an imaginary line beginning at ground level at the outward end of the clear zone and rising at a 1:50 ratio, i.e., 1 foot vertically for every 50 feet horizontally, as it extends away from the clear zone. The contour of the land affects the actual elevation of this imaginary line above any given portion of plaintiffs’ properties.
7. The Base is equipped with and uses “Ground Control Approach” (GCA), a radar system for landing aircraft under conditions of poor visibility. The flight path of aircraft landing by GCA on each of the runways at the Base is an imaginary line beginning at ground level 1,000 feet back from the end of the runway and extending upward over the projected center line of the runway at an angle of 2.5 degrees. The contour of the land affects the actual elevation of this imaginary line also above any given portion of plaintiffs’ properties.
*452 8. The table below shows the approximate position of each of plaintiffs’ properties in relation to each of the runways of the Base. The distance from the projected center line of each runway is shown to the nearest corner of each tract,

except in those instances where the projected center line crosses some portion of a tract. The distance from the end of each runway is likewise to the nearest corner of each tract, which in each instance is the northeast corner, and the elevation of the 1:50 minimum safe glide angle and of the GCA flight path is taken at each such point.
9. The following types of planes are among those which have been operated from the Base:
A propeller-driven twin-engine medium bomber. They were used extensively during World War II and until Turner Field was inactivated in 1946.
P-51. A propeller-driven single-engine fighter aircraft which was first assigned to the Base after it had been reactivated in late 1947. They were in use at the Base at least through September 1951.
*453 F~80. A single-engine jet fighter aircraft. Sixteen were assigned to the Base about September 1948. F-80s were assigned to the Base until 1954.
T-33. A two-place single-engine jet trainer. It was used also for administrative flying and instrument checks. There are customarily two to six of these planes assigned to any Base that operates jet aircraft. They have been at the Base since the first jets arrived there in 1948 The T-33 is a trainer version of the F-80C. It is sometimes also used as a fighter.
F-84-0. A jet fighter with a single engine generating about 4,400 pounds of thrust. Some were assigned to the Base about September 1948. The F-84 was the primary aircraft with which the Base was to be equipped. However, they did not begin regular operation at the Base until 1949. Most of them were taken to England when the Wing went there on temporary duty about December 1950, but a few of them which were left were used until 1954.
F-8J¡.E. Substantially the same aircraft as the F-84C and the F-84G. Aircraft of this model were first assigned to the Base in the latter part of 1951 and early 1952. They were left in Japan when the Wing returned from temporary duty there in October 1952.
F-8J¡.G. The different variations of the engine used in this aircraft developed from 5,700 pounds of thrust up to about 6,200 pounds of thrust. This was the first aircraft to operate from the Base using “jato,” or jet assisted takeoff. It commenced operations at the Base in 1952. The replacement of the F-84G model by the F-84F was begun in the late fall of 1954. The use of the F-84G was eliminated as the F-84Fs were brought in, the greater part of the deliveries of the F-84Fs being made in the spring of 1955.
F-84-F. This aircraft differs from other models of the F-84 in that it has a swept wing rather than a straight wing. Its engine generates 7,200 pounds of thrust, with later variations going as high as approximately 7,600 pounds. It was at the Base from 1954 to 1957.
B-57. This is a twin-engine jet medium bomber with three crew positions used for photo-reconnaissance. An undis *454 closed number was assigned to the Base in 1956 and withdrawn in 1957.
F-100. This is a single place, single engine, jet fighter, the only aircraft to be equipped with an afterburner. Between 70 and 78 of them were assigned to the Base in 1956. They were removed in late 1958.
B-52. This is a heavy bomber with eight jet engines, and, as stated, one of the largest jet aircraft used by the Air Force. At takeoff with full power, each of its engines develops between 8,000 and 10,000 pounds of thrust. An undisclosed number was assigned to the Base in July 1959.
KB-29. This is also known as the B-29. It is a four engine, propeller-driven heavy bomber converted to a tanker. About 15 were assigned to the Base in 1954. They were replaced in 1957 by KB-50s, which are essentially the same type of aircraft.
Miscellaneous propeller-driven aircraft, including the twin-engine CM7 (commonly known as the DC-8), the twin-engine C-45 Beechcraft, and others.
10. Before attempting a takeoff in any jet aircraft, the pilot computes the take-off roll, which is the amount of runway needed to become airborne and clear a 50-foot obstacle at the end of the runway. F-84s taking off to the southwest from runway No. 1 would normally require about 5,700 to 7,000 feet of roll before becoming airborne, the length of roll depending on various factors such as atmospheric temperature and weight of load. As the F-84s proceeded to the southwest and passed over plaintiff’s properties, they would normally be at elevations ranging from 300 to 700 feet above the ground. This is the situation as to all models of the F-84. Because of said variations, however, flights of F-84s over plaintiffs’ properties sometimes were as low as approximately 100 to 150 feet.
11. The take-off pattern of T-33s in the first half of 1951 was such that they usually had sufficient altitude and airspeed as they passed over the northwest comer of an area called Pineview, located northeast of Baker Heights and southeast of Woodlawn, to start a left turn so as to avoid the city of Albany. This left turn was made in conformity with Air Force Regulation 60-16, which specifies that air *455 craft are not to fly over cities or populated areas if it can be avoided. On such a takeoff a T-33 would fly over Pineview and tracts 2-A, 2-B, 2-C (Baker Heights), and 2-D in varying degrees, as it is difficult for a pilot to fly the same pattern at all times. Over Baker Heights the elevation of a T-33 was normally about 400 feet.
12. A B-52 taking off to the southwest from runway No. 2 normally passes over plaintiffs’ properties at an altitude between 750 and 1,000 feet. On the one occasion when an altimeter reading was taken while the aircraft was climbing during takeoff, the indicated reading over a viaduct immediately to the southwest of tracts 2-A, 3 and 4-A was 1,000 feet. Since the altimeter records altitude above mean sea level, and the elevation of the viaduct is approximately the same as runway No. 2, which is 211.5 feet above mean sea level, the B-52 at the time of that reading was about 790 feet above the ground. Thus its altitude as it passed over plaintiffs’ properties on that occasion was somewhat less than 790 feet.
13. In a “visual flight rule” (VFK.) landing, it is standard Air Force procedure for a jet fighter to start its initial approach approximately 3 miles from the runway and at least 1,500 feet above the ground. This initial approach is made along the projected center line of and on the same heading as the runway. In landing from the southwest the pilot approaches the projected center line at a 45-degree angle so as not to fly over the city, then turns into the initial approach about 3 miles from the Base. As the aircraft comes over the end of the runway the pilot makes either a continuous 360-degree turn or two 180-degree turns, descending at a rate which will enable him to roll out on his final approach 2,500-3,000 feet from the end of the runway at an altitude of not less than 500 feet. The distance from the end of the runway at which the final approach is begun varies widely with the technique of the individual pilot. If four planes of a flight are coming in together rather than one plane alone, some of the planes may roll out on their final approach as much as 5,000-6,000 feet or more from the end of the runway. When the pattern is extended for any reason, the pilot increases power to hold between 1,000 and 1,500 *456 feet altitude until he can finally roll out, and then he is on a long descending final approach. In the case of an F-84, the pilot must keep power on during the final approach because of the tendency of the F-84 to drop quickly.
14. Under normal training conditions, all landings by the B-52 are by instruments, that is “ground control approach” (GCA) landings. Other aircraft make GCA landings only for training purposes or when weather conditions require them. On a GCA approach an aircraft in flight encounters the beam 7 miles out from the end of the runway and at an altitude of 1,500 feet. The GCA Controller on the ground is able to tell when the aircraft is deviating from the flight path, and can instruct the pilot by radio to correct his position. It is the better practice to be above the GCA flight path than below it, but it is possible to drop as much as 25 feet below and still recover position to make a proper landing. Such deviations occur often.
15. The normal flight path of an aircraft on a VFB, landing is higher than the GCA flight path. A final approach by a jet fighter which begins 2,000 feet from the runway at an altitude of 500 feet would be 358 feet higher than the GCA flight path at that point, and even if it were as low as 500 feet in beginning a final approach 3,000 feet from the runway it would still be 321 feet higher than the GCA flight path. The elevations at which an aircraft will fly on a GCA approach are considered to be safe elevations throughout the entire length of the GCA flight path.
16. Beginning in 1941, when Turner Field was established, the aircraft assigned to or visiting Turner Field made numerous flights to and from the southwest end of runway No. 1. In making the flights, the takeoffs toward and the landings from the southwest sometimes resulted in aircraft flying at elevations as low as 100 to 150 feet over all of the plaintiffs’ properties. These planes, including the twin engine, propeller-driven B-25 bombers used at the Base commencing in 1943, were noisy but were not so obnoxious as to be intolerable to plaintiffs. With the reactivation of Turner Field in September 1947 the single engine, propeller-driven P-51s, and later the single-engine jet T-33s, F-80s, F-84Cs, F-84Es and F-84Gs were noiser and still more *457 annoying than the planes in use prior to deactivation, but the noise which they made was still not intolerable to plaintiffs and their families.
As previously noted, at least 75 F-84 jet aircraft were assigned to the Base in the latter part of 1948 and thereafter, in 1949, commenced full operational flights. From that time to the present, jet air traffic has varied according to the number of aircraft assigned to the Base and according to the number of transient aircraft. However, since 1948, when jet aircraft were first regularly operated, numerous and frequent flights at low elevations over all of the plaintiffs’ properties have been made while aircraft were taking-off from or landing on the southwest end of runway No. 1.
17. Between 1948 and 1955, the frequent and low flights of jet aircraft created considerable noise and vibration while flying over the plaintiffs’ properties. However, although the noise and vibration were annoying to plaintiffs during this period and sometimes woke them or their children, the discomfort was not so severe as to seriously interfere with the use and occupation of their premises until about April 1955. Prior to 1954, there were not so many flights made as subsequent thereto and there were long periods of reduced activity while some of the units stationed at the Base were on temporary duty overseas. As stated, late in 1954 and early in 1955, the F-84Fs were introduced on the Base, and flight activity thereafter increased. The F-84F is a swept-wing aircraft and therefore is readily distinguishable from the straight-wing F-84G which it replaced. The noise created by the F-84F was different from the noise of other jets which had been used at the Base, and was more annoying and terrifying to plaintiffs than the noise produced by the previous planes at the Base. It emitted a shrill, high-pitched, intense, noise. Noise from low-flying aircraft using the Base first became intolerable to plaintiffs with the coming of the F-84F. A number of KB-29s, which were four engine, propeller-driven B-29s converted to tankers, were brought to the Base at the same time as the F-84Fs. These tankers also made a very loud, and what was to plaintiffs, a terrifying noise as they flew over plaintiffs’ properties, particularly on takeoff. They were flown in order that *458 the F-84Fs might practice midair refueling. The F-100s, the single-engine jets which replaced some of the F-84s, were just as noisy, particularly when the afterburner was turned on. The eight-engine B-52 jet bombers in use at the Base since about July 1959 are the noisiest of all the planes which have been operated from the Base.
18. There is no existing record of takeoffs and landings at the Base during the period 1949-1954. From records which are available a tabulation has been made of the number of landings made by Turner Air Force Base crews, by type of aircraft, by month, for the period November 1,1957 through August 31, 1958. The number of takeoffs duplicates the number of landings. These figures may include landings at other bases by aircraft possessed by Turner Air Force Base. They do not include landings made at the Base by transient aircraft being flown by crews from other bases. The total number of landings for the 10-month period was 13,376, or an average of 1,337.6 per month. Of this number, 7,061 landings were by F-100 jets and 2,002 landings by T-33 jets, a total of 9,063 landings by jet aircraft. KB-50 tankers made 805 landings.
19. Landings and takeoffs are about equally divided between the northeast and southwest ends of the runways. The direction of prevailing winds at the Base is such that the wind blows from those directions which would dictate a takeoff to the northeast and a landing from the southwest for about the same proportion of the time that it blows from the directions which would dictate a takeoff to the southwest and a landing from the northeast. The remainder of the time there are either crosswinds or a calm.
20. (a) On August 12,1955, the pilot of an F-84F taking off toward the southwest from runway No. 1 experienced difficulty in maintaining directional control of the aircraft in the existing crosswind conditions which prevailed and used his brakes several times during the take-off roll. The aircraft, instead of attaining flying speed at the 6,300-foot mark as it normally would have done under similar wind and temperature conditions, did not become airborne until it had rolled approximately 9,000 feet. A part of the aircraft struck the crash barrier 85 feet from the southwest end *459 of the runway, then struck four heavy cables at a height of 52 feet, after which it sheared off the top of a house, setting the house on fire, and completely demolished a two-story garage apartment. Two people were killed in the buildings which were struck by the aircraft, and there was fire damage to neighboring properties. This crash occurred within 200-250 feet of the home of plaintiff L. Eugene Mock, II (plaintiff No. 7) on tract 7 and in close proximity to the homes of the other plaintiffs on tracts 1, 4r-B, 5 and 6. The crash did not occur on any land owned by any of the plaintiffs.
(b) During the time that the Base has been in operation, there have been a number of other crashes of planes operating out of the Base, some of them in the general vicinity of plaintiffs’ properties. These occurred both before and after the crash of August 12, 1955. However, none of them were as close to the properties as the crash of August 12, 1955, and in none of them were any persons on the ground or in residences killed. The nearest of these other crashes to plaintiffs’ properties was approximately 1 mile away.
21. Prior to the arrival of the F-84Fs at the Base in 1954, the plaintiffs composing the Baker Heights partnership (plaintiff No. 2) laid out the Baker Heights Subdivision and put in paved streets and water mains. Between October 19, 1954 and May 25, 1955, 21 lots were sold in Baker Heights. A building contractor who bought seven of these lots built houses on them, six of which were sold before they were completed. However, the seventh, completed in May 1955, was not sold until September 1955. The builder paid one-half of the settlement costs as an added inducement to the purchaser to complete the transaction. The purchaser had made no deposit which could be forfeited, as the property was being financed on a 100 percent Veterans’ Administration loan. This seventh house was equally as desirable as the other houses. This builder had planned to build other houses in Baker Heights and to buy several more lots from the partnership, but because of the August 1955 plane crash he made no further purchases, believing that no additional new houses in Baker Heights would sell under the prevailing conditions at prices which would warrant his constructing them.
*460 22. A general contractor wbo bad built between 300 and 350 bouses in Albany, Georgia, since 1951, took an option in February 1955 on 11 lots in the Baker Heights Subdivision, paying a binder of $1,100. He has never exercised his option, as he has not been able to obtain Federal Housing Administration (FHA) commitments or even conventional financing for construction on these lots. This contractor had extensive experience in obtaining financing, as he had personally arranged for the financing of all the houses he had built. The plane crash in August 1955 affected adversely the marketability of the Baker Heights lots and the other properties in the approach zones of the Base as residential property.
23. The airplane crash in August 1955 coincided, approximately, with an increase in noise because of newer planes being introduced on the Base. Prior to said crash, the FHA was willing to insure loans in the approach zone area, but the agency will no longer do so. Similarly, the VA made loans in the approach zone area prior to the 1955 crash, but is no longer doing so. A few sales are still being made in the approach zones but the properties are not bringing as much money as they would have prior to August 1955, and for the most part financing on the properties was arranged prior to August 1955.
24. Approvals for VA financing were available for the lots in Baker Heights prior to the plane crash in August 1955. Similarly, conventional financing for the Baker Heights lots prior to the 1955 crash was available. After the crash on August 12, 1955, VA financing was not available for any of the Baker Heights lots, which had the effect of decreasing their market value. The crash brought the realization to the general public of the great danger in the approach zones from jet aircraft using the Base. In 1948 or 1949 an appraisal of a house for the Veterans’ Administration next door to where the plane crashed in 1955 was made, and little concern was felt then about the flights of aircraft overhead. Since the crash, sales of property in the approach zones have been possible only where the property was already financed or the seller would finance by taking back a large mortgage, and even in such cases the sale price has generally been under the market.
*461 25. Aircraft flew over the properties herein involved in landing on and taking off from the Base at altitudes of about 100 to 400 feet, with the majority of flights falling in the 200-350-foot range. Some jet planes fly and have flown close enough over the tops of pines about 75 feet high that the jet blows the limbs of the trees about. Sometimes the planes are so low that persons on the ground can distinguish the different colors of the pilots’ helmets. The noise and discomfort from these low flights cause telephone conversations, radio programs and TY programs to be drowned out. Sleep is disturbed, windows rattle, and social life is restricted.
26. There has been some difference in the flight pattern since runway No. 2 was opened in 1959 as the planes now come more directly over the houses in the Baker Heights Subdivision and at lower altitudes. However, generally there has been no substantial difference in the pattern of flights over plaintiffs’ properties since the commencement of operations on enlarged runway No. 2 in 1959. Two property owners in the subdivision have been trying without success to sell their property. Several owners in this subdivision have sold their houses but were not able to realize anything on their equities. The B-52s make an exceptionally loud, screaming, roaring noise. The noise of the F-100 with afterburner operating is also extremely intense at the altitudes at which it flies over the properties herein involved. The houses tremble and the windows rattle. Sleep is not only disturbed by the noise, but at night the whole area is brightly illuminated by the landing lights of the incoming planes. In late 1958, when the mission of Turner Air Force Base was changed from that of a fighter command to that of a bomber command and the B-52 eight-engine bombers were subsequently assigned -to the Base, plaintiffs justifiably became more fearful of living in the approach zones of the runways.
27. The parties have stipulated and agreed that in the event the court shall find that the action of the defendant in operating aircraft at Turner Air Force Base constituted the taking of an interest in plaintiffs’ properties, or any of them, then the fair market value as of the date of such *462 taking of the interests so taken, as to each parcel, shall be as follows:
1. Kate Mock Bacon_ $5, 000
2. Bertha Mock Davis, Stella Mock Hunter, Kate Mock Bacon and Alma Mock Hilsman, a partnership doing business as Baker Heights:
As to Tract A_ $2, 500
As to Tract B_ 750
As to Tract C_ 22,250
As to Tract D_ 2, 500
Total for Baker Heights_ 28, 000
3. Stella Mock Hunter_ 2, 000
4. J. W. Mock
As to Tract A_ $1, 500
As to Tract B_ 8, 000
As to Tract O_ 750
As to Tract D_ 2,750
Total for J1. W. Mock_ 13, 000
5. J. W. Mock, Jr_ 4,000
6. L. Eugene Mock, Sr_ 3, 500
7. L. Eugene Mock, II_ 4, 500
28. The reactivation of the Base in 1947 and the large number of personnel (3,000 to 6,000) stationed there after that time resulted in great improvement in the economy of Albany, Georgia. It was one of the factors which has caused an increase in the value of property in and around Albany. This is largely due to the very large annual payroll, together with the increased demand for housing. While the value of plaintiffs’ properties also commenced to rise with such reactivation (to an extent not shown by the record), such values were also diminished to some relatively small extent (the amount thereof also not shown by the record) by reason of the approach zone location of the properties and the low plane flights over the properties, especially the flights of the jets. From that time to approximately the summer of 1955, the effect of the flights was not such as to interfere substantially with the use of plaintiffs’ properties as residential properties. The value of plaintiffs’ properties was further diminished (to an extent also not shown by the record) by the increased noise and nuisance of the newer and more *463 powerful types of jet planes introduced at the Base in the latter part of 1954 and in greater numbers in the early part of 1955 (principally the F-84Fs, with their terrifyingly loud, shrill noise), the increased flight activity at the Base commencing in 1955, and the consequent more frequent low flights over the properties, and finally and more dramatically, by the aforementioned plane crash of August 1955, following which the usual forms of VA, FHA, and conventional financing for residential properties became unobtainable with respect to transactions in properties located in the approach zones, as were plaintiffs’ properties. After August 1955, the marketability of such properties was seriously affected adversely by such financing restrictions. The introduction of the very large and even noisier eight-engine B-52 jet bombers in 1959 and their frequent low flights over plaintiffs’ properties made such properties even less desirable as residential property and further reduced (by an amount not disclosed by the record) their market value.
Therefore, for our purposes here, the date of taking is found to be August 12, 1955, as requested by plaintiffs in their petition.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, and it is therefore adjudged and ordered that plaintiffs recover of and from the United States the following amounts, together with interest thereon, as part of just compensation, at the rate of four percent per annum, from August 12, 1955, to date of payment:
Kate Mock Bacon (1)_$5,000
Bertha Mock Davis, Stella Mock Hunter, Kate Mock Bacon and Alma Mock Hilsman, a partnership doing business as Baker Heights (2)_ 28, 000
Stella Mock Hunter (3)_ 2, 000
J.W. Mock (4)_13,000
J. W. Mock, Jr. (5)_ 4, 000
L. Eugene Mock, Sr. (6)_ 3,500
E. Eugene Mock, II (7)_ 4, 500
Plaintiffs will execute and deliver to defendant deeds describing and conveying the interests so taken.

 August 12,1955, is tlie date of tlie crash which took two lives. The findings show that said crash coincided approximately with the increase in noise. Therefore, for our purpose we adopt the date of August 12, 1955 as the date of taking and interest, as part of just compensation, will run from said date.