Coe A. BOARDMAN and Martha E., his wife, and Frank J. Smith and Therese E., his wife

v.

**The UNITED STATES.**

No. 346-63.

United States Court of Claims
May 12, 1967.

Stephen A. Cozen, Philadelphia, Pa., for plaintiff. Francis W. Sullivan, Philadelphia, Pa., attorney of record. Sydney C. Orlofsky, Philadelphia, Pa., of counsel.

Arthur C. Latina, Land and Natural Resources Division, Dept. of Justice, with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS,

COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM.

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on July 13, 1966. Exceptions to the commissioner's findings and recommendation for conclusion of law were filed by plaintiffs and the case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiffs are, therefore, not entitled to recover and their petition is dismissed.

Commissioner Bernhardt's opinion,* as modified by the court, is as follows:

Ever since a measure of governmental liability was found by the Supreme Court in the landmark case of United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) for the taking of private property rights by regular aircraft overflights,—a wrong theretofore esteemed by many to be a noncompensable trespass,—lower courts coping with the spate of suits inspired by the *Causby* example have encountered recurring difficulty in fixing the accrual date of each cause of action. That is the problem here, and the petition stumbles on our six-year statute of limitations. 28 U.S.C. § 2501. The plaintiffs' theory of placing the taking date to coincide with a nearby airplane crash in 1961 which dramatized, but did not create, the risk to residential developments neighboring the airport, is not orthodox; nor does it relieve from the bar of the statute the petition filed here in 1963 to redress flight nuisances commencing in 1955 and fluctuating only

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57 (a).

mildly in quantity and quality in succeeding years. In effect, the plaintiffs are necessarily saying that in themselves the overflights from 1955 onward did not deprive their property of residential value, but only when in combination with the risk factor which (according to them) did not emerge until accentuated by the 1961 crash, even though equivalent risks had been latent for as long as planes had flown the local skies.

In June 1955 the plaintiffs, both of them experienced real estate developers and builders, bought 122.32 acres of forested land fringing the northern boundary of the Willow Grove Naval Air Station at Willow Grove, Pennsylvania. The air station, opened in 1943, became in postwar years, and still is, a flight training center for reservists of the Navy, Marines, and Air Force, as well as the Air National Guard. Until July 1955 only propeller-driven aircraft, mostly single-engine fighter types, were assigned to the station, with the exception of a period starting in 1950 when a few twin-engine jet fighters capable of negotiating the relatively short runways were temporarily in operation. A 4,000-foot extension to the north end of the main northwest-southeast runway was built and became operational in July 1955 to permit jet fighter operations, and immediately a number of single-engine F-9 and T-33 jet fighter planes were transferred to the station and an active program was launched to convert reserve pilots of conventional planes into jet pilots. Then and later most of the flight activity at the base involved jet fighter aircraft, primarily during the warmer months on weekends (hence the soubriquet, "weekend warriors") and during annual fortnightly training periods, all of them operating from the extended northwest-southeast runway. Because the plaintiffs' property lay entirely within the approach zone at the northern end of the extended runway, all jet flights taking off to the north or landing to the south on that runway (constituting half or more of all flights due to the prevailing breezes) funneled over the plaintiffs' property at aboveground altitudes ranging from 200 feet to 350–500 feet in taking off across the hither and yonder boundaries, respectively, and from 220 to 303 feet on GCA landings (Ground Control Approach, used under nonvisual weather conditions). These altitudes varied within 50 feet depending on the particular aircraft, type of mission, atmospheric conditions, pilot technique, etc. Visual landings (VFR; 90 percent of total landings) were at higher than GCA altitudes. Propeller-type aircraft using the northwest-southeast runway both before and after its lengthening landed under visual conditions, and took off, at higher altitudes over the plaintiffs' property than their jet counterparts. Commencing in September 1957 the F-9 jets were gradually replaced with F-1's which, because of their superior power and flight characteristics, departed and arrived visually over the property in question at substantially higher levels than other jet aircraft in use there, and produced more noise, but not enough to surcharge the existing easement of flight insofar as the plaintiffs demonstrated. The volume and varieties of flights and aircraft prior to December 1957 (the date six years prior to suit) were not substantially different from those thereafter from the standpoint of increasing the interference with use of plaintiffs' land. At no time prior to at least 1963 were there employed at the station any supersonic jets or ones equipped with afterburners.

The defendant correctly and understandably concedes that these flight activities invaded the plaintiffs' property rights in the "superadjacent airspace", for any residential potential in the land was seriously impaired by the nerve-jangling noise, vibration, and sight of the low-flying planes. Witness graphic proof of this in the written complaint made in January 1957 by the operator of a children's summer day camp to the commandant of the air station. In July and August of each year from 1956 through 1961 the Silver Arrow Day Camp was conducted for young children

on a 21.55-acre piece of the plaintiffs' original tract which they had sold in May 1956. The small tract, containing an old mansion and miscellaneous farm structures, abutted the northern boundary of the base, and was directly in line with the offending northwest-southeast runway. The camp operator's complaint, based upon flights in the summer of 1956, described the location of the camp in direct line with the runway, expressed fear for the safety of the children from planes flying with a "deafening roar" at "extremely low altitudes * * * directly over the camp.", referred to the children as having been "frightened to tears" from the perilous proximity of the passing planes, and requested measures to reduce the hazard. The camp operated only during weekdays when the flight activities ebbed sharply from the heightened weekend traffic, so we may surmise how much more distressing the situation would have been on weekends to permanent residents beneath, had there been any. The complaint was investigated by the air station, but no corrective action consistent with discharge of the Navy mission was deemed possible. If early conditions were so objectionable as to evoke such a complaint, knowledge of them must be imputed to the plaintiffs who could then or at any time prior to the lapse of six years in July 1961 or thereabouts have instituted the present action, rather than delaying the filing of this now time-barred suit until December 1963, as they did.

The plaintiffs purchased the property for the purpose of subdividing and building homes for sale. In mid-1955 they approached both the Federal Housing Administration and the local planning commission in order to obtain the benefits of the FHA loan insurance program in the one case, and to receive tentative approval of a preliminary development plan in the other. In explanation of its refusal the FHA remarked the proximity of the property to the overhead air traffic, and cited its 1954 policy which prohibited loan insurance coverage to properties adjacent to airports. This, of course, would not preclude private financing, if available, but FHA coverage is highly desirable in the marketing of new homes. It may be true as the plaintiffs have averred that they were unaware of the extent and nature of the overflights until 1960, or that they did not know in 1955 that the runway channeling planes over their property had been extended so as to aggravate the problem, but the flight facts were readily apparent to anyone who took the trouble to see or to inquire, and the plaintiffs' professed ignorance of them was their own fault, as was their failure to learn prior to purchasing the property the readily ascertainable facts concerning expansion of the air station's program.

The preliminary development plan which the plaintiffs had presented informally to the local planning commission in 1955 was returned for certain corrections. In 1960 the plaintiffs revived their interest in developing the property and submitted revised development plans to the planning commission, altering them again in early 1961 to meet zoning requirements, only to have them rejected because of the risk entailed in locating a high density residential development in an approach zone of a major runway. The plaintiffs attribute the adverse action of the planning commission to the August 27, 1961 crash of an aircraft into a large store hard by the station, which they urge brought home the hazards of living close to an airport. This, the plaintiffs contend, coupled with seven years of persistent jet flight operations, accrued their cause of action by a process of culmination, for it emphasized and advertised the risk feature with the result of making their property unmarketable for its intended use. This oversimplifies the actuality. The plaintiffs voluntarily elected to postpone reapplying to the planning commission until 1960 for reasons best known to themselves. Had they pursued their initial application in 1955 there is no reason to believe that the planning commission would have ignored the well-known facts of the disadvantageous property location

in relation to flight activity, or would have been any more willing to sanction a high density subdivision in 1955 than in 1961. The plaintiffs overemphasize the effect of the 1961 crash on the commission's action, whereas the reason given by the commission for refusing approval in 1961 would have been equally applicable to 1955, and no doubt as conclusive. The 1961 decision of the commission was not "tacit acknowledgment" that until the crash the public would purchase homes in the development. Since then the plaintiffs have abandoned their plans and the property remains on their hands, useless and unused.

The contention that the cause of action accrued with the crash of August 1961 because it established a risk factor which was theretofore unappreciated is, moreover, vitiated by the record that in the 17 years preceding that incident there had been 17 airplane crashes on or in the vicinity of the same air station, not to mention four additional crashes in the two following years. With this busy fatality record it is idle for the plaintiffs to single out one of many such accidents as the sudden cause of public recognition that the property in suit was unsuitable for homesites from a risk standpoint alone, independent of other harassing features of living in an approach zone which the plaintiffs have purposely underplayed to avoid the limitation defense. If it could not be judicially noticed that hazards would attend living in a development on the plaintiffs' land bordering the airport, the prevalence of accidents in the area over the years would remove any doubts. Furthermore, whereas the degree of interference with a livable environment at the end of a runway might well vary with the type of aircraft, their altitude, number, noise, and general nuisance, there is no reason to believe that the risk inherent in overhead flights varies or is governed by these criteria. The crash of a tiny pleasure plane into a home might be as disastrous to its occupants and as likely but unpredictable in its occurrence as that of a more sophisticated and deadly military aircraft.

It is not seen how the precedents on which the plaintiffs principally rely aid them. Jensen v. United States, 305 F.2d 444, 158 Ct.Cl. 333 (1962); United States v. 3276.21 Acres of Land, 222 F.Supp. 887 (D.C.1963); Bacon v. United States, 295 F.2d 936, 155 Ct.Cl. 441 (1961). All three support the now common view that where the nature and degree of the disturbance to private property rights in approach zones below the line of flight is substantially worsened and rendered intolerable by the use of aircraft which, because of their size, power, noise, altitude and flight characteristics, or because of structural changes in the airport layout, impose a greater degree of interference in the enjoyment of property over which they pass en route to or from their operating runways than the conditions which previously inhered, a significant depreciation in the market value of the property as a direct result of the overflights is not only prerequisite to recovery of just compensation but also marks the date of taking from which applicable statutes of limitation commence to run and valuations for damage purposes are to be measured. This may or may not coincide with the advent of the equipment creating the surcharge, according to the time of total impact in numbers and types of aircraft, frequency and altitude of flights, noise, danger, and other incidents which impair the normal enjoyment of property and hence its market value. Risk of crashes is but one of many elements to consider and, standing alone, has not yet been held to trigger a taking of property in the Constitutional sense or to amount to more than a trespass. It is true that in the *Bacon* case, supra, a fortuitous crash near the home of one plaintiff happened to coincide chronologically with the culminating effect of a new breed of aircraft (the F-84f) which, because of their number, flight frequency, and significantly different operating characteristics were more disruptive to dwellers in the approach zone below their repeated passage than the types of aircraft which they displaced or augmented, and thus

effected not only a taking but also caused the withdrawal of previously available FHA, VA, and conventional financing forms so indispensable to marketability.

We cannot say with any confidence at what precise point after the first arrival of jets at Willow Grove in July 1955 they reached the level of substantial interference, but it is clear that it was reached at least by the summer of 1956 when conditions prompted the convincing complaint by the proprietor of the Silver Arrow Day Camp, referred to above. There is minor conflict in the testimony on the score of low and frequent flights, but it is inconceivable that those witnesses of the plaintiffs who were on the property and saw few or no aircraft skirting the treetops during periods of prime activity could have been so oblivious of conditions which affected the day camp so profoundly. The belying flight statistics, sketchy as they are in breakdown, raise the question of the credibility of those who were there and profess to have seen or heard nothing untoward.

■ The differences between the present case and those cited by the plaintiffs are obvious. A long record of aircraft accidents antedating the 1961 crash by 17 years established, unlike the *Bacon* case, that a serious potential risk not only existed but had materialized and was known throughout the Willow Grove area, so that the 1961 crash, no matter how well-publicized it may have been, was only anticlimatic to the clear warnings which past events had supplied so abundantly. Further, the withdrawal of FHA and VA loan guarantee protection in the *Bacon* case was contemporaneous with the crash and the actionable peak of the overflight burden, whereas in the present case the FHA had precluded plaintiffs from its program in 1955, the overflights became onerous no later than the summer of 1956, and the suit was filed seven years later. The refusal of the planning commission to approve the plaintiffs' development plan in 1961, discussed earlier, may evidence the cause of plaintiffs' loss, but does not mark its inception. It could not be argued that because the planning commission rejected the plaintiffs' proposal in 1961 that the plaintiffs were forgivably blind to the reasons in existence for the preceding six years, or could not have taken appropriate action more seasonably. The planning commission did not withhold its rejection waiting for the overflights to become intolerable or for a plane to crash; it was merely not called upon to pass judgment until the plaintiffs applied. A clear line must be drawn between cause and effect.

The record contains voluminous data on valuation for the determination of damages, but it is not reflected herein because the plaintiffs have failed to establish the existence of liability and the petition should be dismissed.