**CITY OF AUSTIN, Petitioner,**

v.

**TRAVIS COUNTY LANDFILL COMPANY, L.L.C., Respondent.**

**No. 00–0944.**

Supreme Court of Texas.

Argued Oct. 17, 2001.

Decided March 28, 2002.

Rehearing Overruled May 30, 2002.

Pamela Stanton Baron, David Allan Smith, Asst. City Atty., Andrew Dwight Martin, City Atty., Reynolds Miller Shelton, Asst. City Atty., Austin, James D. Ossyra, Hopkins & Sutter, Chicago, IL, for petitioner.

John N. McClish, Womack & McClish, Austin, for respondent.

Justice O'NEILL delivered the opinion of the Court.

In this case we consider the constitutional standard necessary to establish a "taking" of private property by aircraft overflights under the Texas Constitution. *See* TEX. CONST. art. I, § 17. Purporting to follow *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), the court of appeals affirmed the trial court's compensation award to the property owner. 25 S.W.3d 191, 204. It held that a decrease in the land's fair market value caused by airport operations resulted in a taking even though the landowner did not show that overflight effects had directly harmed the underlying property. *Id.* at 201. While we agree that *Causby* defines the constitutional standard neces-

sary to prove a taking in this case, we conclude that the court of appeals misapplied that standard. To establish a taking by aircraft overflights, a landowner must show that the overflight effects impacted the land directly, immediately, and substantially so that the property was unusable for its intended purpose. *See Causby,* 328 U.S. at 266, 66 S.Ct. 1062. Because here the landowner's evidence did not meet this standard, the landowner did not establish a taking. Accordingly, we reverse the court of appeals' judgment and render judgment that the property owner take nothing.

## I Background

Bergstrom Air Force Base, located in southeast Travis County, was closed in 1991 as a part of the federal government's military-base closure policy. Under a 1942 agreement between the federal government and the City of Austin, the Bergstrom property reverted to the City. The City decided to develop a new municipal airport at the Bergstrom location, and the City's voters approved Austin–Bergstrom International Airport's (ABIA's) construction in a May 1993 referendum. The airport began civilian operations in June 1997, and some military flights still operate from the airport. This case involves the municipal airport's impact on Travis County Landfill Company's (TCLC's) nearby property.

TCLC owns a 133–acre tract of land located about one-half mile south of the airport's main runway. TCLC's predecessor in interest, 244 Joint Venture, obtained a Type IV landfill permit for this tract that would allow it to receive non-putrescible dry waste, such as construction rubble, tree clippings, and tires. Although the permit was obtained in 1988, an ensuing lull in building projects resulted in an insufficient stream of construction waste, causing the company to postpone opening the landfill. By the time of trial, landfill operations had still not commenced and the property remained undeveloped raw land.

Significant legal restrictions pre-existing the airport's municipal use limit TCLC's use of the airspace immediately above its land. The property is burdened by a Deed of Easement that TCLC's predecessor in interest granted to the United States and which the City now owns. That deed conveys what is called an avigation easement, which allows 60,900 military aircraft unobstructed passage over TCLC's property each year. The deed also describes certain airspace above the property as approach-departure and transition zones, and conveys a "clearance" or "obstruction" easement that allows the City to prohibit or remove vegetation, buildings, and other structures that extend into those zones.

When civilian flights began operating from Bergstrom in 1997, TCLC sued the City alleging that the flights over its property constituted an unconstitutional taking of its property. *See* TEX. CONST. art. I, § 17. TCLC sought a judgment declaring that the avigation easement does not grant the City civilian overflight rights. It also requested a temporary injunction preventing the City from directing civilian flights over its property until the City obtained overflight rights through condemnation proceedings or the purchase of an easement.[1] TCLC further sought actual and exemplary damages for trespass and in-

---

1. The trial court issued a temporary injunction, which the City appealed. Ultimately, the court of appeals dissolved the injunction. *City of Austin v. Travis County Landfill Co.,* No. 03–97–00515–CV, 1998 WL 78641 (Tex. App.—Austin February 26, 1998, no pet.) (not designated for publication).

verse condemnation, together with attorneys' fees, interest, and costs.

At trial, TCLC's experts testified that, excluding the airport's existence, the highest and best use of TCLC's property is a Type IV landfill vertically expanded beyond its existing permit. The evidence indicates that, absent the airport, TCLC could have obtained a vertical expansion from the Texas Natural Resource Conservation Commission. But, apparently, in reaching this conclusion, the experts did not consider the pre-existing military-avigation easement, ongoing military flights from the municipal airport, or the City's clearance easement. According to TCLC's experts, the airport's operations substantially reduced the property's fair market value because (1) TCLC was unable to vertically expand its landfill beyond the existing permit, and (2) there are increased risks associated with operating a landfill in close proximity to a municipal airport. 25 S.W.3d at 201. Both parties' experts agreed that the property's fair market value, excluding the airport from consideration, was $9,800,000. But they disagreed about the property's value after taking the airport's operation into account.

The trial court submitted both liability and damage issues to a jury. The jury found that the City took the airspace over TCLC's property by overflights associated with the airport's operation. It also determined that the fair market value of TCLC's property after the taking was $6,850,000. The City moved for judgment notwithstanding the verdict, claiming that there was no evidence that the overflights interfered with TCLC's use and enjoyment of the property. The trial court denied the City's motion and rendered judgment in TCLC's favor for $2,950,000, the difference in the property's value before and after the taking. The trial court also entered findings of facts and conclusions of law in support of the judgment, concluding that the City took TCLC's property by overflights without adequate compensation. But it refused TCLC's request for attorneys' fees and injunctive relief. Both the City and TCLC appealed.

The court of appeals, with one justice dissenting, affirmed the trial court's judgment and compensation award. 25 S.W.3d at 204. Only the City petitioned this Court to review the court of appeals' judgment. We granted the City's petition to decide whether TCLC established that the civilian overflights, above and beyond the military overflights, constituted a taking under the Texas Constitution.

## II The Constitutional Standard

Article I, section 17 of the Texas Constitution provides that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person...." Tex. Const., art. I, § 17. The federal takings clause is substantially similar. *See* U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation"). This similarity has led us, in other contexts, to rely on the United States Supreme Court's interpretation of the federal takings clause in construing our takings provision. *See, e.g., City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 231, 242 (Tex. 2001) (examining federal precedent to decide the framework for determining whether utility charges constitute a taking); *Mayhew v. The Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex.1996) (citing *Causby* for the proposition that determining whether a taking occurred is a question of law).

We have never decided when aircraft overflights constitute a taking of property under our constitution, though our courts

of appeals, including the court of appeals in this case, have invoked the federal standard. *See* 25 S.W.3d at 198; *see also Wilkinson v. Dallas/Fort Worth Int'l Airport Bd.*, 54 S.W.3d 1, 16–17 (Tex.App.—Dallas 2001, pet. denied) (holding overflights must cause a direct, immediate, and substantial interference with the landowner's use and enjoyment); *City of Houston v. McFadden*, 420 S.W.2d 811, 814 (Tex. Civ.App.—Houston [14th Dist.] 1967, writ ref'd n.r.e) (recognizing a taking-by-overflight claim under the federal standard). Because both the City and TCLC argue that Texas takings jurisprudence tracks the federal taking-by-overflight standard, we assume, without deciding, that the federal and state constitutions provide the same protections from overflight effects. *See Mayhew*, 964 S.W.2d at 932 (applying the "more familiar" federal land-use standard to a taking claim because the claimant urged that Texas follows the federal jurisprudence). Thus, we consider TCLC's taking claim under the federal *Causby* standard.

*Causby* states that the "air is a public highway," and airspace above the land "is part of the public domain"; thus, the inconveniences that flights over private property cause "are normally not compensable under the Fifth Amendment." *Causby*, 328 U.S. at 261, 266, 66 S.Ct. 1062. To constitute a taking, the flights over private land must be "so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land." *Id.* at 266, 66 S.Ct. 1062. In *Causby*, the claimants operated a commercial chicken farm and lived on their property. *Id.* at 259, 66 S.Ct. 1062. Military aircraft, including fighters, transports, and bombers, continuously overflew the land, creating "startling" noise that caused a substantial number of the claimants' chickens to die and caused a drop in production from others. *Id.* Because of the over-

flights, the land could no longer be used as a commercial chicken farm. *Id.* The evidence also showed that loud noise and the planes' bright lights frequently deprived the claimants of sleep, and they became nervous and frightened. *Id.* The Court held that these facts established "a direct and immediate interference with the enjoyment and use of the land." *Id.* at 266–67.

Similarly, in *Griggs v. Allegheny County*, civilian airplane overflights caused noise comparable to that of "a riveting machine or steam hammer" that made people in the house unable to converse or sleep. 369 U.S. 84, 87, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). The overflights caused vibrations that separated plaster from the walls and ceilings, and the residents became nervous and distraught. *Id.* Residential use became impossible, and the claimants were forced to move out of their home. *Id.* Applying *Causby*, the Supreme Court held that the overflights had so interfered with the claimants' use and enjoyment of their property that a taking occurred. *Id.* at 87–88, 82 S.Ct. 531.

In *McFadden*, the Fourteenth Court of Appeals followed *Griggs* and recognized a takings claim when the evidence showed that aircraft overflights caused blinding glare, intense noise that made communication impossible, jet sprays, and vibrations that broke windows and cracked walls. 420 S.W.2d at 814. Other jurisdictions have also held that overflight-related effects that impact the property's surface, such as noise, vibrations, and fumes, constitute a taking by overflight. *See Melillo v. City of New Haven*, 732 A.2d 133, 140, 141 (Conn.1999) (observing that the trial court's finding that noise and turbulence interfered with enjoyment of the property was enough to establish a taking under *Causby* and therefore under the Connecticut Constitution, but concluding that the plaintiffs were not entitled to compensa-

tion because they failed to show economic harm); *Johnson v. City of Greeneville,* 222 Tenn. 260, 435 S.W.2d 476, 478–80 (1968) (concluding that allegations that noise and vibrations from airplane overflights caused physical distress and fear and interfered with the property's use stated a takings claim under the Tennessee Constitution); *State v. City of Columbus,* 3 Ohio St.2d 154, 209 N.E.2d 405, 408–09 (1965) (holding that there was a taking under the Ohio Constitution when the evidence demonstrated that overflights caused disruption of sleep and physical damage to walls and personal property); *Martin v. Port of Seattle,* 64 Wash.2d 309, 391 P.2d 540, 540–42 (1964) (stating that noise from airplanes' takeoff and landing can establish a taking under the Washington Constitution); *Johnson v. Airport Auth. of Omaha,* 173 Neb. 801, 115 N.W.2d 426, 434–35 (1962) (affirming trial court's judgment in the property owner's favor in a condemnation case under the Nebraska and federal Constitutions when the evidence showed that intense vibrations interfered with the property's use and enjoyment and caused fear); *Smart v. City of Los Angeles,* 112 Cal.App.3d 232, 238, 169 Cal.Rptr. 174 (Cal.Ct.App.1980) (stating that a taking claim did not accrue for limitations purposes when there was no "alter[ation] or damage [to] the physical characteristics of the land or interference with its use"); *Hillsborough County Aviation Auth. v. Benitez,* 200 So.2d 194, 196, 199 (Fla.Dist. Ct.App.1967) (holding that, under the Florida Constitution, a taking by overflight occurred because conversations were impossible, television reception was disturbed, sleep was interrupted, fuel residue was deposited on property, and vibrations affected the residential structure).

Thus, the federal standard and the standard that various state courts have recognized requires that, to rise to the level of a constitutional taking, the overflight-related effects must directly, immediately, and substantially impact the property's surface so that it is no longer usable for its intended purpose. *See Causby,* 328 U.S. at 262, 66 S.Ct. 1062 (highlighting examples of taking by overflights, including a factory relegated to grazing land and an orchard reduced to a vegetable patch); *Griggs,* 369 U.S. at 89 82 S.Ct. 531 (overflights rendered residential living impossible); *see also Cheyenne Airport Bd. v. Rogers,* 707 P.2d 717, 724 (Wyo.1985) (noting that federal and state courts have consistently held that a taking-by-overflights claim does not exist unless the overflights create a nuisance such as surface impacts).

■ Under *Causby, Griggs,* and their progeny, to establish a taking by aircraft overflights, a landowner must show that the flights directly, immediately, and substantially interfere with the land's use and enjoyment. To meet this standard, the landowner must show that the overflight effects directly and immediately impact the land so that the property is no longer usable for its intended purpose. It is against this constitutional standard that we review the evidence that TCLC presented here.

### III Standard of Review

■ In this case, the trial court submitted the taking question to the jury, instructing them that a taking by overflight occurs if "the flights result in a substantial interference with the owner's ability to use and enjoy his property *or* if the overflights result in a substantial decrease in the market value of the property." (Emphasis added). The dissenting justice in the court of appeals concluded that this instruction, which allowed the jury to find a taking on the alternative basis that the overflights caused a decrease in the property's market value, was

an incorrect statement of the law that probably caused the rendition of an improper judgment. 25 S.W.3d at 211 (PATTERSON, J., dissenting). We agree that the trial court incorrectly stated the law by equating a fair-market-value decline with a taking without considering the overflights' immediate and direct effects on the land's surface. *See Causby,* 328 U.S. at 265, 66 S.Ct. 1062. However, determining whether a taking has occurred is a question of law for the court. *General Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex.2001) (relying on *Mayhew,* 964 S.W.2d at 936). Consequently, the jury's conclusion that the overflights resulted in a taking of TCLC's property is immaterial. *See Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex. 1994).

 The trial court made findings of fact and conclusions of law to support its final judgment, and found that "[f]lights through TCLC's airspace from ABIA result in a substantial interference with TCLC's ability to use and enjoy its property *and* result in a substantial decrease in the market value of the property." (Emphasis added). Although, as we have said, a decrease in market value alone will not support the conclusion that a taking has occurred, the trial court also found that the overflights substantially interfered with TCLC's use and enjoyment of its property. While we depend on the factfinder "to resolve disputed facts regarding the extent of governmental intrusion," the ultimate issue of whether the facts constitute a taking is a question of law. *Mayhew,* 964 S.W.2d at 933. Accordingly, in this case, we decide whether the evidence

established that civilian overflights, above and beyond the military overflights and their accompanying pre-existing burden on the property, rise to the level of a constitutional taking.

## IV The Evidence

The evidence that TCLC relies upon to support its taking claim falls into four general categories: (1) invasion of TCLC's airspace by civilian overflights; (2) a decrease in the fair market value of TCLC's property; (3) increased risks and operating costs associated with operating a landfill in close proximity to the airport; and (4) increased risk of liability due to bird air-strike hazards.[2] But none of these factors are immediate, direct, and substantial overflight effects that rendered TCLC's property unusable for its intended purpose.

### A. Invasion of TCLC's Airspace

TCLC argues that its taking claim is based on "the right to exclude overflights by civilian cargo and passenger jetliners." TCLC argues that, "[a]lthough the right to exclude military avigation had been sold, the right to demand additional compensation should Bergstrom become a civilian airport remained a portion of the bundle of rights" retained by TCLC. Thus, it claims, evidence of civilian overflights alone is enough to show that an unconstitutional taking of property occurred. We disagree.

 A landowner has no right to exclude overflights above its property, because airspace is part of the public domain.

---

2. TCLC also claimed that there was substantial interference with its use and enjoyment of the property because the airport overflights prevented it from vertically expanding its landfill. But TCLC disclaims that argument here, stating in its brief that "TCLC's liability case is not predicated upon the loss of its ability to expand the landfill." Consequently, we do not consider the effect of TCLC's inability to expand the landfill in evaluating its taking claim.

*Causby*, 328 U.S. at 266, 66 S.Ct. 1062. Rather, a property owner is entitled to compensation if its property is taken by overflights that immediately and directly interfere with the property's use and enjoyment. *Id.* This inquiry requires a more extensive factual showing than the mere existence of overflights. As one federal court has noted, "an invasion of airspace above surface land does not *per se* constitute a taking." *Brown v. United States*, 73 F.3d 1100, 1104 (Fed.Cir.1996); *see also Ronald C. Bodine v. U.S.*, 210 Ct.Cl. 687, 688, 1976 WL 23873 (1976) ("[T]here are no cases concerning the wrongful use of airspace only."). That civilian aircraft overflew TCLC's property, without more, does not establish that an unconstitutional taking occurred.

## B. Decline in Fair Market Value

■ Although the Texas Constitution forbids the taking of private property without adequate compensation, it does not "require compensation for every decrease in market value attributed to a governmental activity." *Felts v. Harris County*, 915 S.W.2d 482, 484 (Tex.1996); *see also Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 131, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (holding that diminution in fair market value, alone, does not establish a taking). We are aware of no court that has held that a decline in land's fair market value, by itself, establishes that a taking by aircraft overflights has occurred. Some courts have considered fair-market-value decline as a factor in determining whether the government has interfered with the property's use and enjoyment. *See, e.g., Brown*, 73 F.3d at 1105 (holding that a significant and immediate decline in market price that is directly attributable to overflights strongly suggests such interference); *Branning v. United States*, 228 Ct.Cl. 240, 654 F.2d 88, 102 (1981) (concluding that noise created

by overflights " 'practical[ly] destr[oyed]' " the property and decreased its market value, which resulted in a taking (quoting *Aaron v. United States*, 160 Ct.Cl. 295, 311 F.2d 798, 801 (1963))); *Long v. City of Charlotte*, 306 N.C. 187, 293 S.E.2d 101, 110 (1982) (stating that no taking occurs unless the overflights amount to a " 'material interference with the use and enjoyment of property such that there is substantial diminution in fair market value' " (quoting *Cochran v. City of Charlotte*, 53 N.C.App. 390, 281 S.E.2d 179, 186 (1981))); *Thornburg v. Port of Portland*, 244 Or. 69, 415 P.2d 750, 751–52 (1966) (measuring substantial interference by the property's fair-market-value decline). But the market-decline factor has been carefully limited to situations in which the decline was "directly attributable to overflights" and their direct effects on the property's surface. *Brown*, 73 F.3d at 1104–05; *see also Persyn v. United States*, 34 Fed. Cl. 187, 207 (Fed.Cl.1995) (observing that a significant decrease in the property's market value " 'as a direct result of the overflights' " is a prerequisite for recovery (quoting *Boardman v. United States*, 180 Ct.Cl. 264, 376 F.2d 895, 899 (1967))); *Branning*, 654 F.2d at 102 (holding that noise associated with military overflights destroyed the value of property for residential use); *Hoyle v. City of Charlotte*, 276 N.C. 292, 172 S.E.2d 1, 10–11 (1970) (relying on the physical effects of overflights, including noise, to conclude that overflights have affected the property's market value).

■ In this case, on the other hand, the record does not show that overflight-related effects directly impacted the property's surface and caused the property's value to decline. TCLC does not even allege that overflight effects, such as noise, fumes, or fuel sprays impacted the use and enjoyment of its property as a landfill. Nor did

TCLC's appraisal expert consider the civilian overflights' effects on the property's use and enjoyment in calculating the property's fair market value after the alleged taking. Because TCLC failed to show that civilian overflight effects caused or contributed to the land's market-value decline, that decline, alone, does not establish a constitutional taking.

## C. Increased Risks and Landfill–Operation Costs

██ TCLC argues that the civilian overflights and general airport operations exposed it to increased risks and costs associated with operating the landfill, and that this is sufficient to establish interference with TCLC's use and enjoyment of the property. But to establish a taking claim, TCLC must show that the civilian overflights, separate and apart from the burdens already imposed on its property by ongoing military flights and the accompanying military-avigation easement, substantially increased risks and costs that interfered with the property's use as a landfill. TCLC relies on two federal cases—*Avery v. United States*, 165 Ct.Cl. 357, 330 F.2d 640 (1964) and *Davis v. United States*, 155 Ct.Cl. 418, 295 F.2d 931 (1961)—that hold that a subsequent taking occurred because additional military overflights, above and beyond those covered by a pre-existing easement, began. But both cases are distinguishable. In *Davis*, the court held that the property owner established a subsequent taking because the introduction of new, dramatically noisier military aircraft rendered the residence "uninhabitable" and property improvements "substantially worthless." *Davis*, 295 F.2d at 932–33. Likewise, in *Avery*, the court relied on the addition of "larger, heavier, noisier" military aircraft that affected the property's use and enjoyment to conclude that a subsequent taking occurred. *Avery*, 330 F.2d at 642.

Here, however, TCLC presented no evidence that the addition of civilian overflights caused overflight effects that interfered with the use of TCLC's property as a landfill. Although TCLC's appraisal expert did testify that there are risks associated with the landfill's close proximity to Bergstrom and that "the flights are low and frequent and that adds … potential hazards to the property," this conclusory opinion is contrary to the expert's concession that he did not consider the effects of actual flights over the property. Moreover, the testimony fails to connect the alleged risks with overflight effects and does not establish that those risks interfered with the property's use as a landfill. TCLC's only argument is that the additional civilian overflights exceeded the scope of the pre-existing military-avigation easement. But this is not enough to establish that overflights, above and beyond the property's pre-existing burdens, substantially interfered with the property's use and enjoyment as a landfill.

██ TCLC also failed to quantify these risks and hazards or specifically describe how they interfered with TCLC's use and enjoyment of the property. Such nonspecific allegations are not enough to establish a taking, because a property owner must demonstrate that the interference with the property's use and enjoyment is "substantial." *See Brown*, 73 F.3d at 1102. Although TCLC explains that operating restrictions require it to prevent smoke, dust, and birds from interfering with overflights, and that these restrictions impinge on TCLC's use and enjoyment of the property, the evidence did not demonstrate that civilian overflights would actually cause TCLC to incur additional costs or that those additional costs would be substantial. The only evidence of increased costs TCLC presented related to bird-dis-

persal programs, but these requirements were a condition for TCLC's landfill permit before the civilian overflights began. Thus, any expenses TCLC incurred were not attributable to civilian overflights, but to pre-existing burdens imposed on its property by ongoing military overflights and the accompanying military-avigation easement. We conclude that TCLC failed to present any evidence that civilian overflights increased the risks and costs of operating the landfill, or that these risks and costs substantially interfered with TCLC's use and enjoyment of the property.

### D. Bird–Strike Liability

Finally, TCLC argues that civilian overflights from Bergstrom expose it to increased potential liability from bird strikes. There is no evidence, and TCLC does not even allege, that the bird-dispersal program already in place as a condition of TCLC's permit would, because of civilian overflights over and above the burdens imposed on its property by ongoing military overflights and the accompanying military-avigation easement, fail to properly protect its airspace from birds. Consequently, there is no support for TCLC's argument that it would face increased liability from bird strikes. Thus, the judgment has no evidentiary support on this basis.

In sum, TCLC's taking claim focuses on nonspecific economic injuries and airspace invasion due to general airport operations. TCLC failed to allege, much less prove, that overflight-related effects from civilian overflights above and beyond the ongoing military overflights and the accompanying military-avigation easement directly, immediately, and substantially interfered with its use and enjoyment of the property. And because before and after the alleged taking TCLC was authorized to op-

erate a Type IV landfill—the property's intended use—there is no evidence that the overflights rendered the property unusable for its intended purpose.

### V Conclusion

To establish a taking of private property by aircraft overflights in this case the landowner had to show that the overflight effects directly, immediately, and substantially impacted the land so that the property was unusable for its intended purpose. TCLC presented no such evidence. Because the evidence does not establish a taking, the court of appeals erred in awarding compensation to TCLC. Accordingly, we reverse the court of appeals' judgment and render judgment that TCLC take nothing.