Affirmed and Opinion filed April 8, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00473-CV

___________________

 

Dawn A. Alewine, ET AL., Appellants

 

v.

 

The City of Houston, Appellee



 



 

On
Appeal from the County Civil Court at Law No. 3

Harris County,
Texas



Trial Court Cause No. 850479

 



 

 

OPINION

Appellants,
a collection of homeowners in a subdivision neighboring Bush Intercontinental
Airport, sued appellee, the City of Houston, because the construction of a new
runway resulted in increased airplane flights over a corner of their
neighborhood.  The City successfully moved for summary judgment, arguing the
homeowners were not entitled to compensation for inverse condemnation or
intentional nuisance because they had not shown their property was “taken” by
the government.  This appeal ensued.

Under current Texas law,
appellants are not entitled to compensation because they have not shown the
increase in overflights – though a constant source of frustration – has
rendered their homes unusable for residential use.  Therefore, we must affirm
the judgment.

I.

Background

Appellants, sometimes
referred to as “the homeowners,” consist of eighty-three residents who live in
forty-six houses in the Woodcreek Subdivision.  The neighborhood contains a
total of 539 homes, constructed at various times since 1979.

The neighborhood is
located near Bush Intercontinental Airport, which opened in 1969.  On November
1, 2003, the airport opened a new east-west runway, designated “8L-26R.”  The
flight path for some aircraft that use this runway extends over the southwest
tip of the neighborhood,[1]
which lies just west-northwest of the airport, and therefore through the
airspace of a handful of homes in the subdivision.  Thus, while the
neighborhood experienced some overhead air traffic before 2003, the number of
airplanes passing over a corner of their subdivision greatly increased
following the construction of the new runway.

On October 31, 2005,
residents from various parts of the neighborhood filed suit against appellee,
the City of Houston (the “City”), alleging intentional nuisance and inverse
condemnation.  Generally, the plaintiffs claimed the City, by building a new
runway leading to increased overflights, “took” their property without
compensation, in violation of Article I, Section 17 of the Texas Constitution.

The City denied liability
and filed a motion for summary judgment, arguing (1) the homeowners’ complaints
do not rise to the level of a constitutional “taking” because their homes
remain habitable; (2) no “taking” occurred because the average noise level in
the neighborhood does not exceed that approved by the federal government for
residential use; and (3) the “community damages rule” bars recovery because all
plaintiffs claimed similar injuries.  The trial court granted summary judgment
without specifying the basis for its ruling.

On appeal, the
homeowners contend the trial court erred by granting summary judgment on their
claims.  We begin with their first issue, in which appellants argue they stated
a valid “takings” claim, after considering the legal standard we use to review
the trial court’s summary-judgment ruling.

II.

Standard of
Review

We review the trial
court’s order granting summary judgment under well-established standards.  See
Seidner v. Citibank (S.D.) N.A., 201 S.W.3d 332, 334 (Tex. App.—Houston
[14th Dist.] 2006, pet. denied).  That is, a party moving for traditional
summary judgment – here, the City – must prove its entitlement to judgment as a
matter of law.  See Tex. R. Civ. P. 166a(c); Nixon v. Mr. Prop. Mgmt.
Co., 690 S.W.2d 546, 548 (Tex. 1985).  At that point, the burden shifts to
the non-movants – the homeowners, in this case – to raise a genuine issue of
material fact to defeat summary judgment.  See Va. Power Energy Mktg., Inc.
v. Apache Corp., 297 S.W.3d 397, 402 (Tex. App.—Houston [14th Dist.] 2009,
pet. denied).  A genuine fact issue exists if reasonable and fair-minded jurors
could reach different conclusions after considering the evidence.  See
Goodyear Tire & Rubber Co. v. Mayes, 236 S.W.3d 754, 755 (Tex. 2007).

On appeal, we review the
summary-judgment motion and evidence de novo.  See Valence Operating
Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  We consider the evidence
in the light most beneficial to the non-movants, indulging reasonable
inferences and resolving doubts in their favor.  City of Keller v. Wilson,
168 S.W.3d 802, 824 (Tex. 2005); Va. Power, 297 S.W.3d at 402.  When, as
here, the trial court grants summary judgment without specifying the basis for
its ruling, we must affirm if any of the grounds advanced in the motion is
meritorious.  See W. Invs., Inc. v. Urena, 162 S.W.3d 547, 550 (Tex.
2005).  To prevail on appeal, then, the homeowners must show the trial court
could not properly grant summary judgment on any of the grounds stated in the
motion.  See Star-Telegram, Inc. v. Doe, 915 S.W.2d 471, 473 (Tex.
1995).

III.

Analysis

In their first issue,
the homeowners contend their summary-judgment evidence, taken as true,
demonstrates a governmental “taking” because the increased overflights have
interfered with the use and enjoyment of their property.  In response, the City
urges us to apply a higher legal standard requiring the homeowners to also show
their property is no longer usable for residential purposes.  Thus, the
resolution of this issue requires us to decide upon the appropriate legal test
to prove a taking-by-overflight claim.

A.        “Takings”
Jurisprudence, Generally

A government is vested
with certain inherent powers commensurate with its status as a sovereign,
including the right of “eminent domain” in which private property is taken – in
exchange for compensation – and converted for public use.  See Taub v.
Aquila Sw. Pipeline Corp., 93 S.W.3d 451, 456 (Tex. App.—Houston [14th
Dist.] 2002, no pet.); Villarreal v. Harris County, 226 S.W.3d 537, 544
(Tex. App.—Houston [1st Dist.] 2006, no pet.); see also Byrd Irrigation Co.
v. Smythe, 146 S.W. 1064, 1065 (Tex. Civ. App.—San Antonio 1912, no writ)
(“The power of eminent domain is an attribute of government, and is inherent in
it.”).  Some “takings” are more conspicuous than others.  

For example, the
government may institute a formal “condemnation proceeding” to acquire property
for public use if it cannot reach agreement with the owner as to the
appropriate amount of compensation.  See Tex. Prop. Code Ann. § 21.012
(Vernon 2004 & Supp. 2009).  That process is governed by statute,[2] and the statutory
requirements must be strictly observed.  Coastal Indus. Water Auth. v.
Celanese Corp. of Am., 592 S.W.2d 597, 599 (Tex. 1979); see State v.
Bristol Hotel Asset Co., 65 S.W.3d 638, 646–47 (Tex. 2001).  Here, however,
the City did not file condemnation proceedings seeking to acquire the
homeowners’ property.

Instead, this case would
more appropriately be described as an “inverse condemnation” action, in which
an owner claims his property has already been taken – outside of proper
condemnation proceedings – without compensation.  See Tarrant County Water
Control & Improvement Dist. No. 1 v. Haupt, Inc., 854 S.W.2d 909, 912
n.4 (Tex. 1993); City of Houston v. Mack, ___ S.W.3d ___, No. 01-09-00427-CV,
2009 WL 5064710, at *4 (Tex. App.—Houston [1st Dist.] Dec. 22, 2009, no pet.). 
In that situation, an aggrieved property owner may bring an
inverse-condemnation action under Article I, Section 17 of the Texas
Constitution which, like the United States Constitution,[3] protects against a
governmental “taking” of private property without compensation.  See Tex. Const. art. I, § 17; Gen.
Servs. Comm’n v. Little-Tex Insulation Co., 39 S.W.3d 591, 598 (Tex. 2001).

To recover compensation
for inverse condemnation under Article I, Section 17, a claimant must plead and
prove (1) an intentional governmental act; (2) resulted in a “taking” of his
property; (3) for public use.[4] 
See Little-Tex, 39 S.W.3d at 598; Park v. City of San Antonio,
230 S.W.3d 860, 867 (Tex. App.—El Paso 2007, pet. denied).  Here, the parties’
dispute focuses only on the second prong of this test,[5] that is, the proof
necessary to establish a “taking” of property by airplane overflights.

Actually, the scope of
their disagreement as to the appropriate legal test is quite narrow.  Both cite
City of Austin v. Travis County Landfill Co., 73 S.W.3d 234 (Tex. 2002)
(“TCLC”) as controlling authority.  In addition, the parties agree that,
under TCLC, “to establish a taking by aircraft overflights, a landowner
must show that the flights directly, immediately, and substantially interfere
with the land’s use and enjoyment.”  Id. at 240.  However, the City
contends the homeowners must also show the overflights have rendered
their homes uninhabitable – that is, unusable for their intended purpose – to
prove a constitutional “taking” of property.  Appellants disagree.

Whether particular facts
give rise to a “taking” of property is a question of law we review de novo.[6]  See id. at
241; Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 937 (Tex. 1998).  In
deciding whether a “taking” has occurred, we may consult federal cases
interpreting comparable language in the Fifth Amendment to the United States Constitution. 
See Sheffield Dev. Co. v. City of Glenn Heights, 140 S.W.3d 660, 669
(Tex. 2004); Mack, ___ S.W.3d ___, 2009 WL 5064710, at *4.  We begin,
then, with authority from the United States Supreme Court.

B.        Taking
by Overflight

The seminal case in the
area of overflight-takings jurisprudence is United States v. Causby, 328
U.S. 256 (1946).  There, the United States Supreme Court addressed the question
of whether property could be considered “taken,” under the Fifth Amendment, by
the frequent and low-altitude passage of military aircraft above the owner’s
land.  See id. at 258.  The owners had operated a chicken ranch on the
property but were forced to give up their business because of the noise
generated by heavy military planes flying only sixty-three feet above the barn:

[Aircraft] come close enough at times to appear barely to
miss the tops of the trees and at times so close to the tops of the trees as to
blow the old leaves off.  The noise is startling. . . . As a result of the
noise, respondents had to give up their chicken business.  As many as six to ten
of their chickens were killed in one day by flying into the walls from fright. 
The total chickens lost in that manner was about 150.  Production also fell
off.  The result was the destruction of the use of the property as a
commercial chicken farm.

 

Id.
at 259 (emphasis added).  In addition, the Court observed that the owners, who
also lived on the property, were frequently unable to sleep and had become
nervous and frightened.  See id.

The Court found those
facts sufficient to establish a Fifth Amendment taking but declined to
define the outer boundary of proof necessary to show a taking by
overflight:

The airspace, apart from the immediate reaches above the
land, is part of the public domain.  We need not determine at this time what
those precise limits are.  Flights over private land are not a taking, unless
they are so low and so frequent as to be a direct and immediate interference
with the enjoyment and use of the land.  We need not speculate on that phase of
the present case.

 

Id.
at 266–67.  Notably, the Court suggested a compensable taking would occur if
overflights limited the utility of the land, as by rendering residential
property uninhabitable.  See id. at 261–62.  However, the Court did not
directly indicate whether such a showing was necessary.[7]

The topic of “unusability”
was again mentioned, but not expressly described as essential to a “takings” claim,
in the subsequent case of Griggs v. County of Allegheny, Pennsylvania,
369 U.S. 84 (1962).  As with the chicken ranch in Causby,[8] the Griggs Court
concluded a “taking” had occurred because frequent low-altitude overflights
rendered the affected property unusable as a residence.  See id. at 87,
89.  Specifically, the flights made conversation and sleep impossible, rattled
house windows and caused plaster to fall, and impaired the occupants’ health.  See
id. at 87.  In addition, the house was located so near the runways that, in
the event of aircraft engine failure, the pilot “would have no course but to
plow into [the] house.”  Id.

Five years later, this
Court cited Griggs in affirming an inverse-condemnation judgment in
favor of a property owner whose residence had become uninhabitable because of
overflights.  See City of Houston v. McFadden, 420 S.W.2d 811, 816 (Tex.
Civ. App.—Houston [14th Dist.] 1967, writ ref’d n.r.e.).  In that case, airplanes
flew as low as eighty feet above the house, leading to broken windows, cracks
in the wall, and deafening noise levels of up to 109 decibels.  See id.
at 813.  Because the Federal Housing Administration deemed noise levels of 100
decibels “unacceptable for residential use,” it refused to insure the
plaintiff’s mortgage.  See id. at 814, 816.  Thus, it was determined
that the property could not be used as a residence, and was instead better
suited for industrial use.  See id. at 814.  

However, McFadden,
like Causby and Griggs, does not squarely address the issue
presented here.  Those courts determined only that proof of uninhabitability
can be sufficient to establish a taking of residential property.  See
Causby, 328 U.S. at 261–62; Griggs, 369 U.S. at 87, 89; McFadden,
420 S.W.2d at 813–14.  They did not, however, expressly describe such evidence
as necessary to a valid inverse-condemnation claim.  

Nevertheless, the Texas
Supreme Court added that evidentiary requirement in 2002, when it decided TCLC. 
There, the plaintiff owned property, which it intended to operate as a
landfill, roughly one-half mile away from the main runway at Austin-Bergstrom
International Airport.  See TCLC, 73 S.W.3d at 237.  In 1997, however, the
airport begin accepting civilian air traffic, prompting TCLC to sue the City of
Austin for an alleged taking-by-overflight under Article I, Section 17 of the
Texas Constitution.  See id.  The jury found a compensable taking and
awarded damages, but the Texas Supreme Court granted the City of Austin’s
petition for review “to decide whether TCLC established that the civilian overflights
. . . constituted a taking under the Texas Constitution.”  Id. at 238.

The parties apparently
assumed, as they do here, that Texas follows the federal taking-by-overflight
standard.  See id. at 239.  Therefore, the Court analyzed the validity
of TCLC’s claim under Causby, without specifically addressing whether
the Texas Constitution affords the same level of protection from overflight
effects.  See id.  After reviewing Causby, Griggs, and McFadden,
as well as authority from other jurisdictions, the Court recited the applicable
legal standard as follows:

[T]o establish a taking by aircraft overflights, a
landowner must show that the flights directly, immediately, and substantially
interfere with the land’s use and enjoyment.  To meet this standard, the
landowner must show that the overflight effects directly and immediately
impact the land so that the property is no longer usable for its intended
purpose.

 

Id.
at 240 (emphases added).  Thus, although not explicitly stated in Causby
and Griggs, the Court expressly interpreted those cases as requiring
the landowner to prove his property unusable for its intended purpose to
establish a compensable taking.  See id.[9]

The insertion of an “unusability”
requirement in TCLC was neither careless nor inadvertent; instead,
similar language appears at least eight other times in the Court’s opinion:

·       
“To establish a taking by aircraft overflights, a landowner must
show . . . that the property was unusable for its intended purpose.”  Id.
at 237.

·       
“[T]o rise to the level of a constitutional taking, the
overflight-related effects must directly, immediately, and substantially impact
the property’s surface so that it is no longer usable for its intended
purpose.”  Id. at 240.

·       
“None of [TCLC’s evidence shows] immediate, direct and
substantial overflight effects that rendered TCLC’s property unusable for its
intended purpose.”  Id. at 241.

·       
“TCLC does not even allege that overflight effects . . . impacted
the use and enjoyment of its property as a landfill.”  Id. at 242
(emphasis added).

·       
“[T]o establish a taking claim, TCLC must show that the civilian
overflights . . . interfered with the property’s use as a landfill.”  Id.
at 243 (emphasis added).

·       
“Here, however, TCLC presented no evidence that the addition of civilian
overflights caused overflight effects that interfered with the use of TCLC’s
property as a landfill.”  Id. (emphasis added).

·       
“[T]he testimony fails to . . . establish that those risks
interfered with the property’s use as a landfill.”  Id.
(emphasis added).

·       
“[B]ecause before and after the alleged taking TCLC was
authorized to operate a Type IV landfill – the property’s intended use –
there is no evidence that the overflights rendered the property unusable for
its intended purpose.”  Id. at 244 (emphases added).

Further, the Court’s
disposition of the case hinged upon the evidence – or lack thereof – of
usability.  Ultimately, the Court determined TCLC had not proven its property
unusable as a landfill, concluded no “taking” had occurred, and therefore
reversed and rendered judgment in the City’s favor:

To establish a taking of private
property by aircraft overflights in this case the landowner had to show that
the overflight effects directly, immediately, and substantially impacted the
land so that the property was unusable for its intended purpose.  TCLC
presented no such evidence. . . . [T]he evidence does not establish a taking[.]

 

Id.

We do not divine from Causby
and Griggs any overt requirement that the landowner prove his property
unusable for its intended purpose; the Texas Supreme Court, however, does. 
Whether we agree with TCLC is of no moment because, as an intermediate
court of appeals, we are obligated to follow established precedent from the
Texas Supreme Court.  See Lubbock County, Tex. v. Trammel’s Lubbock Bail
Bonds, 80 S.W.3d 580, 585 (Tex. 2002); Lundstrom v. United Servs. Auto.
Ass’n-CIC, 192 S.W.3d 78, 94 (Tex. App.—Houston [14th Dist.] 2006, pet.
denied).  In this case, then, we hold that, to demonstrate a compensable
taking-by-overflight under current Texas law, the homeowners were required to
prove the overflights directly, immediately, and substantially impacted the
land so as to render their property unusable for its intended purpose as a
residence.  See TCLC, 73 S.W.3d at 244.

C.        Application
to Facts

Applying that stringent
standard to the summary-judgment evidence contained in the record, we must
conclude the homeowners have not stated a viable “takings” claim.  In their
brief, appellants do not contend their houses have been rendered uninhabitable.[10]  Instead, they
fairly summarize their complaints, which are described more fully in over 900
pages of deposition testimony in the record, as follows:  “Plaintiffs have
testified that conversations were impossible, television reception was
disturbed, sleep was interrupted, children and pets were frightened or became
nervous or irritable, and it was difficult to entertain company or to conduct
telephone conversations.”

None of the homeowners
testified they cannot live in their homes because of the overflights.  To the
contrary, some residents either flatly refused to move or confirmed they can
still “lead normal lives” despite the increased noise levels.  In addition, the
record does not suggest that houses in the neighborhood have been abandoned or
lie vacant.  Instead, residents seeking to leave the subdivision, for whatever
reason, apparently have been able to find ready purchasers for their property
since the construction of the new runway in 2003.  Moreover, the record
contains evidence that roughly half of the houses have increased in
value since 2003.

The homeowners uniformly
testified the increase in overflights has made their neighborhood a less
desirable place to live.  Under TCLC, however, that evidence does not
rise to the level of a compensable “taking” under Article I, Section 17.  See
TCLC, 73 S.W.3d at 244; see also Genter v. Blair County Convention &
Sports Facilities Auth., 805 A.2d 51, 56 (Pa. Commw. Ct. 2002) (“’Merely
having a house that is somewhat less desirable to live in does not constitute
the type of exception circumstance needed to prove a de facto taking of
an entire residential property.’”) (citation omitted).

We hold that, under
current Texas law, appellants have not presented evidence raising a genuine
fact issue as to a “taking” of their property.  Therefore, the trial court did
not err by granting the City’s motion for summary judgment, and we overrule
their first issue on appeal.  Having done so, we need not address their
remaining challenges to the trial court’s judgment.  See Tex. R. App.
47.1; W. Invs., Inc., 162 S.W.3d at 550 (requiring courts to affirm
summary judgment if any stated ground is found to be meritorious).  Accordingly,
we must affirm the judgment.

III.

Conclusion

We are not unsympathetic
to the frustration the homeowners have experienced as a result of the increased
noise levels in their neighborhood.  Several residents testified to such
problems as increased irritability and stress caused by a disruption in their
normal sleep habits, and embarrassment in trying – often unsuccessfully – to
hold outdoor gatherings for friends and family.  

However, these
complaints, though certainly not insignificant, do not amount to a
constitutional “taking” of their property, under current Texas law, absent a
showing by individual homeowners that their houses are no longer usable for
residential purposes.  See TCLC, 73 S.W.3d at 244.  Accordingly, we
affirm the trial court’s judgment.

 

                                                                                    

                                                                        /s/        Kent
C. Sullivan

                                                                                    Justice

 

 

Panel consists of Chief
Justice Hedges and Justices Seymore and Sullivan.

 









[1] One of appellants’ expert
witnesses confirmed the flight path does not intrude “very far into the
neighborhood.”





[2] See Tex. Prop.
Code Ann. §§ 21.001–.024 (Vernon 2004 & Supp. 2009), 21.041–.065 (Vernon
2000 & Supp. 2009).





[3] See U.S. Const. amend. V.





[4] This same test also
applies to the homeowners’ claims for intentional nuisance.  See City of
Dallas v. Jennings, 142 S.W.3d 310, 315–16 (Tex. 2004) (“[A] city may be
held liable for a nuisance that rises to the level of a constitutional
taking.”) (emphasis added) (citing City of Abilene v. Downs, 367
S.W.2d 153, 159 (Tex. 1963)).





[5] In its motion for summary
judgment, the City did not challenge the homeowners’ proof as to the first and
third elements of the constitutional-takings test.





[6] At least one court has
observed that constitutional-takings analysis is not particularly
user-friendly.  See Md. Port Admin. v. QC Corp., 529 A.2d 829, 833 (Md.
1987) (“To date courts have not developed a test which can be comprehensively
and consistently applied to determine whether a government has taken
property.”).  Often, the determination depends heavily upon the unique facts of
each case.  See Air Pegasus of D.C., Inc. v. United States, 424 F.3d
1206, 1212 (Fed. Cir. 2005).

In this case, the City suggests average noise levels
could be used as an objective barometer of whether residential property
has been rendered uninhabitable by overflights.  That approach would seemingly
appeal to those seeking a more predictable, quantifiable test in this context. 
However, the test might be considered underinclusive of some unacceptable
living situations to the extent it may not account for temporary “spikes” of
deafening noise that could render a house uninhabitable even though the average
decibel level falls within an acceptable threshold.  In this case, for example,
one resident testified, “[T]he [noise-level] rating . . . averages events over
a 24-hour period . . . when in fact numerous events that are in excess of 90
decibels can occur and really disrupt your life.”





[7] In their brief,
appellants contend the Court expressly rejected an uninhabitability requirement
in Causby.  We disagree; the Court held only that an owner need not
prove his property has been completely destroyed and unusable for all
purposes in order to recover compensation for a taking.  See Causby, 328
U.S. at 262.  Stated differently, under Causby, the government may not
avoid an otherwise valid takings claim simply by, for example, arguing
residential purpose could be repurposed for industrial use.  See id.





[8] In Griggs, the
Court summarized its previous holding in Causby as follows:  “[Causby]
held that the United States by low flights of its military planes over a
chicken farm made the property unusable for that purpose and that therefore
there had been a ‘taking’, in the constitutional sense, of an air easement for
which compensation must be made.”  Griggs, 369 U.S. at 88 (emphases
added).





[9] But see Hillsborough
County Aviation Auth. v. Benitez, 200 So. 2d 194, 198–99 (Fla. Dist. Ct.
App. 1967) (finding residential property was “taken” under the Florida
Constitution even though overflights did not render houses uninhabitable), cited
in TCLC, 73 S.W.3d at 240.  In Benitez, however, the plaintiffs also
demonstrated, unlike here, that the overflights were actually weakening the
structural integrity of their homes, raising a question as to their continued
habitability.  See id. at 196, 199.





[10] We are not aware of any
objective test for habitability in this “takings” context.  Under the
landlord-tenant framework, for example, the Texas Legislature has recognized
that premises may be rendered uninhabitable by a “condition [that] materially
affects the physical health or safety of an ordinary tenant.”  Tex. Prop. Code
Ann. §§ 92.052(a)(3), 92.056(b)(2) (Vernon 2007 & Supp. 2009); Timberwalk
Apartments, Partners, Inc. v. Cain, 972 S.W.2d 749, 755 (Tex. 1998)
(indicating chapter 92 sets out “specific minimum standards of habitability”). 
Because appellants do not contend their homes are uninhabitable, we need not
define the scope of that term here.  See Thompson v. Ricardo, 269 S.W.3d
100, 103 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding appellate
courts lack authority to render advisory opinions).  However, we note an
objective standard for proving a residence has been rendered “unusable for its
intended purpose,” see TCLC, 73 S.W.3d at 244, would add some degree of
predictability to a decidedly unclear and fact-bound area of the law.