200 So.2d 194 (1967)
HILLSBOROUGH COUNTY AVIATION AUTHORITY, a Public Body Corporate, Appellant,
v.
Corando BENITEZ, Jr., et al., Appellees.
No. 7055.
District Court of Appeal of Florida. Second District.
May 24, 1967.
Rehearing Denied July 12, 1967.
*195 Stewart C. Eggert, of Allen, Dell, Frank & Trinkle, Tampa, for appellant.
Thomas A. Clark, of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, for appellees.
ALLEN, Chief Judge.
The defendant-appellant, Hillsborough County Aviation Authority, hereinafter called the Authority, in an action for "in verse condemnation," has filed this appeal from an adverse final decree entered by the Circuit Court of Hillsborough County. The decree directed the Authority to file condemnation proceedings against the plaintiffs, appellees here, condemning an avigational easement directly and diagonally above, across and over the appellees' properties beyond the altitude of 250 feet, pursuant to Chapters 73 and 74 of the Florida Statutes, F.S.A.
The appellant-Authority has presented five questions to this court for determination. We deem those questions to be as follows:
I. Whether the appellees are entitled to assert a private property right in an area declared by the Congress of the United States as "Navigable Airspace" and thus in the public domain.
II. What are the prerequisites for the establishment of a "taking" within the meaning of the Florida Constitution and laws?
III. Whether or not there has been a "taking" under the evidence of this case, and if so, is the appellant the party responsible for the "taking"?
IV. Does the appellant have a prescriptive right of flight over the property of the appellees?
V. Whether the lower court erred in denying the appellant's motion for a severance.
The facts necessary for an adjudication of this case are gleaned from the record and the excellent findings of fact compiled by the able chancellor and are set forth below.
The defendant-appellant Aviation Authority is a public body corporate created by the Legislature of the State of Florida. It has the power of eminent domain and operates the Tampa International Airport. Landings and takeoffs of aircraft at the airport are functions controlled by the Authority and the Federal Aviation Agency. The defendant, however, does not control the flight of aircraft over or near the plaintiffs-appellees' property.
What we now call Tampa International Airport had its early beginning in the 1920's as a private airport. During World War II it became a United States Army installation designated as Drew Field and was used principally as a B-17 Bomber base. After the war, the airport was conveyed to the City of Tampa. Thereafter, it was leased on a long term basis to the Authority. It has been used as the area's commercial airport since 1946. The Authority has added certain properties to its holdings and, for all practical purposes, controls and maintains the airport.
Until 1960, only propeller or prop-jet airplanes used the facility, but in May of 1960 the first pure jet flew into the airport and landed. Since that time the number of jets has gradually increased until 1964 when the number of flights apparently leveled off. This action was commenced in the early part of 1964.
Tampa International Airport has two north-south runways and one east-west runway with which we are here concerned. The western most north-south runway is 8,700 feet long, the eastern most north-south runway is 8,300 feet long and the east-west runway is 6,995 feet long. All of the runways are 150 feet wide. The north-south runways are the dominant runways and are the only runways which are instrumented. The preferential use of the runways is established *196 by a Radio Approach Control (RAPCON) letter issued by the Federal Aviation Agency and this use is as follows: When the wind is under five (5) knots, the north-south runways are to be used exclusively; when the wind is between five (5) and fifteen (15) knots, the north-south runways are to be used except if the wind is blowing within ten (10) degrees north or south of due east or within ten (10) degrees north or south of due west, in which event the east-west runway is to be used. Frequently, pilots will request a given runway to better insure the safety of their passengers and, if such a request is made, the Federal Aviation Agency generally grants the request. In a study made by the F.A.A. it was determined that the primary instrument approach to the airport should be made from the north to the south. This determination was based on findings as to the existing and prevailing winds at Tampa International Airport. The study was made before the construction of the new north-south runway, and since the construction of that runway, the F.A.A. has designated it as an instrument runway and has made it eligible for federal aid for high intensity lighting and other instrumentation.
The defendant is required to control and keep clear of obstruction a "clear-zone" area at the end of each runway. Chances are almost 100% that an airplane, which undershoots a runway, will be in this particular area. The eastern clear-zone area of the east-west runway at Tampa International Airport goes up to Dale Mabry Highway, which would mean that the east end of the clear-zone area would be in excess of 1,500 feet from any of the properties of the plaintiffs.
Plaintiffs' properties are located in Tampa, Florida, lying east of the east-west runway of the airport. With the exception of the Castillo residence, the properties lie between Ivy Street on the south and Abdella Street on the north. A projection of the center line of the east-west runway would extend between Ivy and Abdella Streets. The Castillo property lies on the south side of Ivy. The jet planes using the east end of the east-west runway fly directly over the properties of most of the plaintiffs.
The properties of the plaintiffs lie at a distance of 4,233 feet to 5,405 feet from the east end of the east-west runway. There are no residences between the end of the runway and the residence of the plaintiff Diaz, whose house is the closest to the runway of any of the plaintiffs.
The trial court found, and we adopt this finding, that in landing, the commercial jet airplanes approach plaintiffs' properties at a height of from 250 feet to 500 feet.
Plaintiffs, with few exceptions, had no complaints of interference with the use and enjoyment of their properties until the advent of the jet planes. Several plaintiffs moved into their property after some jets were used at the airport, but before their frequent use and prior to the date of the alleged taking.
The effect of the landing of the jet aircraft and the noise emitted therefrom was stated by the various plaintiffs to affect them in the following ways:
(a) Conversations are impossible;
(b) Television reception is disturbed;
(c) Sleep is interrupted;
(d) Children run into their houses from the yard;
(e) Fear is aroused;
(f) A residue is deposited upon clothes hanging out to dry;
(g) Plaintiffs become nervous or cross and unable to relax;
(h) A vibration occurs, causing nails to loosen;
(i) It is difficult to entertain company because of the interruptions;
(j) Telephone conversations are interrupted; and

*197 (k) The aircraft lights are reflected inside the house.
During a four month period from April, 1965, through July, 1965, there were approximately eight hundred (800) landings and takeoffs of jet air craft over or near the properties of the plaintiffs. Some days there were no flights and the highest number occurring in a single day was forty-four.
The flight of aircraft over or near the plaintiffs' properties has caused a mixed influence on the real estate market and, generally, the value of plaintiffs' properties has been adversely affected. The market of the said properties has been slow. While several of the plaintiffs have made some effort to sell their property without success, a majority of the plaintiffs have not tried and did not wish to sell. Although loans have been made in the subject area by local Federal Savings and Loan Associations, the Federal Housing Administration and the Veterans' Administration have not guaranteed loans.
The properties in question are in an area that has been recommended for non-residential development and exclusion of places of public assembly. These properties are in an aircraft approach zone and an area in which minimum height restrictions are in effect.
The flight operations over the properties involved are necessary and unavoidable in the efficient and proper operation of the Tampa International Airport by the defendant Authority.
The questions presented for our consideration are, as appellant has stated in its brief, of great public interest and importance. It is, therefore, our intention to meet and discuss each of these points as set forth above.
Prior to 1958, the navigable airspace, which Congress had placed in the public domain, was the "airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority." 49 U.S.C.A. § 180, 10A F.C.A. title 49, § 180. Following the decision of the United States Supreme Court in the case of United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), Congress redefined "navigable airspace" to mean "airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include airspace needed to insure safety in take-off and landing of aircraft." 72 Stat. 739, 49 U.S.C. § 1301(24).
The Causby case involved low flights of United States' military planes over a chicken farm. These flights made the property unusable for the purpose of raising chickens. This constituted a "taking," in the constitutional sense, of an air easement for which compensation had to be made. The Court, in discussing "navigable airspace," held that the path of the glide or flight for landing or taking off was not the downward reach of the "navigable airspace."
In Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), we find the Court again discussing "navigable airspace." In its opinion, the Court said: (82 S.Ct. p. 533, 7 L.Ed.2d p. 588)
"* * * By the present regulations [14 CFR § 60.17] the `minimum safe altitudes' within the meaning of the statute are defined, so far as relevant here, as heights of 500 feet or 1,000 feet, `[e]xcept where necessary for take-off or landing.' But as we said in the Causby case, the use of land presupposes the use of some of the airspace above it. 328 U.S. at 264, 66 S.Ct. 1062, 90 L.Ed. 1206. Otherwise no home could be built, no tree planted, no fence constructed, no chimney erected. An invasion of the `superadjacent airspace' will often `affect the use of the surface of the land itself.'"
In Griggs, the Court was not confronted with the question of whether there had been a "taking," but was asked to determine *198 whether Allegheny County, as the owner and operator of the airport, was liable under the theory of inverse condemnation. The Court held that Allegheny County was the responsible party and not the United States.
In Ackerman v. Port of Seattle, 55 Wash.2d 401, 413, 348 P.2d 664, 670, 77 A.L.R.2d 1344, Judge Finley had this to say:
"Section 60.17 of the Civil Air Regulations, which establishes minimum safe altitudes, is presently prefaced with the following exception: `Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes * * *.' 14 C.F.R., § 60.17 (1956). It is the position of the civil aeronautics board that a plane is operating within the navigable airspace when flying a normal and necessary path in approaching or leaving an airport. 19 Fed.Reg. 4602-03 (1954). This is contrary to the decision of the United States Supreme Court in the Causby case, supra, and we believe, is contrary to reason.

"* * *
"In landing and taking off, a plane necessarily flies a few feet, even a few inches, above the ground for some instants. Whether this occurs over airport property or over private property depends upon the size and type of the plane, as well as the size of the airport and the length of the particular runway. We do not believe that the Civil Aeronautics Act is to be interpreted as allowing the civil aeronautics board to place such flights over private property within the public domain. Such an interpretation would be a strained and unnatural construction of the language of the act. Congress has defined navigable airspace (public domain) only in terms of minimum safe altitudes of flight; this definition has not been changed since the Causby case, supra. `Thus, it is apparent that the path of glide' used by planes in landing and taking off from airports `is not the minimum safe altitude of flight within the meaning of the statute.' United States v. Causby, supra."
We agree with the view expressed by the able opinion of Judge Finley and hold that under the facts of the case at bar the superadjacent airspace between 250 feet and 500 feet above plaintiffs' properties has been invaded. This invasion has affected the use and enjoyment of the surface of the appellees' land. For this invasion compensation must be made. In so holding it is incumbent upon us to answer the first question in this manner. Relying on the decisions of Causby, Griggs and Ackerman, we do not believe that the area of airspace over the plaintiffs' properties for which an avigational easement must be condemned is within the "navigable airspace" as contemplated by the U.S. Congress. It is, therefore, not necessary for us to consider whether the appellees are entitled to assert a private right in an area declared by Congress as "navigable airspace."
We now consider questions two and three.
In the second question we are asked to establish the prerequisites for a "taking" within the meaning of the Florida Constitution and laws. This question is much too broad in scope to warrant a detailed discussion of what does or does not constitute a "taking." We are concerned here only with whether there has been a "taking" of an avigational easement over the plaintiffs' properties. We will not undertake to define in precise terms what constitutes a "taking" in all cases. As Judge Hodges pointed out in his "Discussion" of the case,
"The courts have continuously, and are still groping for a precise standard in this regard but thus far none is in sight."
We have carefully considered the cases cited in appellant's brief, which define the word "taking" under our Constitution, and find that these definitions do not apply to *199 the case at bar. Those cases were concerned with the "taking" of land. We are here confronted with the "taking" of an avigational easement above appellees' land. The appellant has the authority under Fla. Laws, 1959, ch. 59-1356, § 9, at 1621 to condemn something less than a complete fee simple interest in appellees' properties. The bill granting certain rights and privileges to the appellant authority provides the following:
"Section 9. Acquisition of lands, and property.  The Authority shall have the power to acquire, by purchase or eminent domain proceedings, either the fees or such rights, title, interest or easement in such lands and property as the Authority may deem necessary for any of the purposes of this act or the existing acts. The right of eminent domain herein conferred shall be exercised by the Authority in the manner provided by law."
The appellees have not asked the Authority to condemn their fee simple interests, but only that portion of the airspace above the land between 250 feet and 500 feet. The facts clearly show that a majority of the appellees have no desire to sell their homes. They have sought the "inverse condemnation" of an avigational easement over their land and we feel that the legislature has provided the Authority with sufficient power to acquire such an easement.
Landings and take-offs of the jet planes have affected the appellees in many ways. A number of the appellees testified that conversations were impossible; their television reception was disturbed; sleep had been interrupted; children ran into their houses from the yard; fear was aroused; a residue was deposited upon clothes hanging out to dry; the appellees became nervous or cross and unable to relax; a vibration occurred, causing nails to loosen; it was difficult for the appellees to entertain company because of the interruptions; telephone conversations were interrupted; and the aircraft lights were reflected inside the houses.
As stated in United States v. Cress, 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746, 753, "it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether there is a taking."
Appellees' testimony referred to above indicates to us that there has been a "taking" in this case. The damage resulting to appellees has been substantial and not merely consequential. The character of the invasion has deprived appellees of the enjoyment and use of their properties, and under the authority of Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585, we hold that the Hillsborough County Aviation Authority is the party responsible for the "taking."
In point four we are asked if appellant has a prescriptive right of flight over appellees' property.
It has been said that there is no single test for discovering in all cases when an avigational easement is first taken by over-flights. Some annoyance must be borne without compensation. The point when that stage is passed depends on a particularized judgment evaluating such factors as the frequency and level of the flights, the type of planes, the accompanying effects such as noise or falling objects, the uses of the property, the effect on values, the reasonable reactions of the humans below, and the impact upon animals and vegetable life. Jensen v. United States, 305 F.2d 444, 158 Ct.Cl. 333 (1962).
Aaron v. United States, 311 F.2d 798, 160 Ct.Cl. 295 (1963), is a case which discusses the question raised by point four. In the Aaron case, Judge Whitaker, speaking for the United States Court of Claims, had this to say:
"When the flights commenced and it was ascertained that the planes passed *200 over the properties at altitudes lower than the navigable air space, and defendant nevertheless continued the flights, it thereby manifested an intention to continue these trespasses on the air space below the navigable air space, which belonged to plaintiffs. But plaintiffs had no use for this air space, except as it contributed to their use and enjoyment of the surface of the ground, and except as it insured against an impairment of their use and enjoyment of the surface of the ground. So long as these flights did not seriously interfere with the use and enjoyment of their properties, the defendant did not impose a servitude upon them for which plaintiffs are entitled to compensation. In our opinion this did not occur until August 1953 * * *.
"* * *
"The use and enjoyment of their properties by plaintiffs during 1952 could not have been substantially interfered with, since there was an average of only two flights a day over their properties. In January 1953, they increased to something over four a day, and by the end of the year they had increased to ten or twelve a day. We think that some time during 1953 there was substantial interference with plaintiffs' use and enjoyment of their properties. * * *
"* * * Although later the flights greatly increased in number, by that time it seems to have been apparent that these flights were to continue for an indefinite time and in increasing volume, * * * [P]laintiffs then knew their use of their properties had been and would continue to be seriously impaired by the flights of these planes. Before that time they were uncertain just how serious the impairment would be or how long it would continue. Before that time we do not think the statute of limitations had begun to run and, hence, plaintiffs' petitions are in time. Cf. United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789."
In the instant case the able Chancellor found that it was not until May of 1960 that the first pure jet flew into Tampa International Airport. We adopt his finding and note that appellees commenced their action against the Authority in early 1964. The record discloses that during a four month period from April through July, 1965, there were approximately eight hundred (800) landings and take-offs of jet aircraft over or near appellees' properties and that as high as forty-four of these had occurred on a single day.
We hold, therefore, that at some time after May of 1960 there was a substantial interference with appellees' use and enjoyment of their properties. The appellant had not established a prescriptive right of flight over these properties prior to the advent of the jet plane at the airport because no jets had landed or taken off from the air facility until after May of 1960. Hence, the appellees are here well within the time required to establish a prescriptive right of flight and the Authority will not be heard to complain of this.
We have considered the question raised by Point V and find that there is no merit in appellant's contention. The lower court did not err in denying the appellant's motion for a severance.
It is our conclusion that the trial court should be and is, therefore, affirmed.
Affirmed.
SHANNON and PIERCE, JJ., concur.