Dawn A. ALEWINE, et al., Appellants,

v.

The CITY OF HOUSTON, Appellee.

No. 14–08–00473–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 8, 2010.

Larry G. Dunbar, James E. Bradley, for appellants.

R. Paul Yetter, Collin J. Cox, Dori Kornfeld Goldman, Yetter, Warden & Coleman, LLP, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices SEYMORE and SULLIVAN.

## OPINION

KENT C. SULLIVAN, Justice.

Appellants, a collection of homeowners in a subdivision neighboring Bush Intercontinental Airport, sued appellee, the City of Houston, because the construction of a new runway resulted in increased airplane flights over a corner of their neighborhood. The City successfully moved for summary judgment, arguing the homeowners were not entitled to compensation for inverse condemnation or intentional nuisance because they had not shown their property was "taken" by the government. This appeal ensued.

Under current Texas law, appellants are not entitled to compensation because they have not shown the increase in overflights—though a constant source of frustration—has rendered their homes unusable for residential use. Therefore, we must affirm the judgment.

### I.

#### BACKGROUND

Appellants, sometimes referred to as "the homeowners," consist of eighty-three residents who live in forty-six houses in the Woodcreek Subdivision. The neighborhood contains a total of 539 homes, constructed at various times since 1979.

The neighborhood is located near Bush Intercontinental Airport, which opened in 1969. On November 1, 2003, the airport opened a new east-west runway, designated "8L–26R." The flight path for some aircraft that use this runway extends over the southwest tip of the neighborhood,[1] which lies just west-northwest of the airport, and therefore through the airspace of a handful of homes in the subdivision. Thus, while the neighborhood experienced some overhead air traffic before 2003, the number of airplanes passing over a corner of their subdivision greatly increased following the construction of the new runway.

On October 31, 2005, residents from various parts of the neighborhood filed suit against appellee, the City of Houston (the "City"), alleging intentional nuisance and inverse condemnation. Generally, the plaintiffs claimed the City, by building a new runway leading to increased overflights, "took" their property without compensation, in violation of Article I, Section 17 of the Texas Constitution.

The City denied liability and filed a motion for summary judgment, arguing (1) the homeowners' complaints do not rise to the level of a constitutional "taking" because their homes remain habitable; (2) no "taking" occurred because the average noise level in the neighborhood does not exceed that approved by the federal government for residential use; and (3) the "community damages rule" bars recovery because all plaintiffs claimed similar injuries. The trial court granted summary judgment without specifying the basis for its ruling.

On appeal, the homeowners contend the trial court erred by granting summary judgment on their claims. We begin with their first issue, in which appellants argue they stated a valid "takings" claim, after considering the legal standard we use to review the trial court's summary-judgment ruling.

## II.

### STANDARD OF REVIEW

We review the trial court's order granting summary judgment under well-established standards. *See Seidner v. Citibank (S.D.) N.A.*, 201 S.W.3d 332, 334 (Tex. App.-Houston [14th Dist.] 2006, pet. denied). That is, a party moving for traditional summary judgment—here, the City—must prove its entitlement to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). At that point, the burden shifts to the non-movants—the homeowners, in this case—to raise a genuine issue of material fact to defeat summary judgment. *See Va. Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397, 402 (Tex.App.-Houston [14th Dist.] 2009, pet. denied). A genuine fact issue exists if reasonable and fair-minded jurors could reach different conclusions after considering the evidence. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex.2007).

On appeal, we review the summary-judgment motion and evidence *de novo*. *See Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005). We consider the evidence in the light most beneficial to the non-movants, indulging reasonable inferences and resolving doubts in their favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex.2005); *Va. Power*, 297 S.W.3d at 402. When, as here, the trial court grants summary judgment without

---

1. One of appellants' expert witnesses confirmed the flight path does not intrude "very far into the neighborhood."

specifying the basis for its ruling, we must affirm if any of the grounds advanced in the motion is meritorious. *See W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex. 2005). To prevail on appeal, then, the homeowners must show the trial court could not properly grant summary judgment on any of the grounds stated in the motion. *See Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995).

## III.

### ANALYSIS

In their first issue, the homeowners contend their summary-judgment evidence, taken as true, demonstrates a governmental "taking" because the increased overflights have interfered with the use and enjoyment of their property. In response, the City urges us to apply a higher legal standard requiring the homeowners to also show their property is no longer usable for residential purposes. Thus, the resolution of this issue requires us to decide upon the appropriate legal test to prove a taking-by-overflight claim.

### A. "Takings" Jurisprudence, Generally

■ A government is vested with certain inherent powers commensurate with its status as a sovereign, including the right of "eminent domain" in which private property is taken—in exchange for compensation—and converted for public use. *See Taub v. Aquila Sw. Pipeline Corp.,* 93 S.W.3d 451, 456 (Tex.App.-Houston [14th Dist.] 2002, no pet); *Villarreal v. Harris County,* 226 S.W.3d 537, 544 (Tex.App.-Houston [1st Dist.] 2006, no pet.); *see also Byrd Irrigation Co. v. Smythe,* 146 S.W. 1064, 1065 (Tex.Civ.App.-San Antonio 1912, no writ) ("The power of eminent domain is an attribute of government, and is inherent in it."). Some "takings" are more conspicuous than others.

For example, the government may institute a formal "condemnation proceeding" to acquire property for public use if it cannot reach agreement with the owner as to the appropriate amount of compensation. *See* Tex. Prop.Code Ann. § 21.012 (Vernon 2004 & Supp.2009). That process is governed by statute,[2] and the statutory requirements must be strictly observed. *Coastal Indus. Water Auth. v. Celanese Corp. of Am.,* 592 S.W.2d 597, 599 (Tex. 1979); *see State v. Bristol Hotel Asset Co.,* 65 S.W.3d 638, 646–47 (Tex.2001). Here, however, the City did not file condemnation proceedings seeking to acquire the homeowners' property.

Instead, this case would more appropriately be described as an "inverse condemnation" action, in which an owner claims his property has *already* been taken—outside of proper condemnation proceedings—without compensation. *See Tarrant County Water Control & Improvement Dist. No. 1 v. Haupt, Inc.,* 854 S.W.2d 909, 912 n. 4 (Tex.1993); *City of Houston v. Mack,* 312 S.W.3d 855, —— (Tex.App.-Houston [1st Dist.] 2009, no pet.). In that situation, an aggrieved property owner may bring an inverse-condemnation action under Article I, Section 17 of the Texas Constitution which, like the United States Constitution,[3] protects against a governmental "taking" of private property without compensation. *See* TEX. CONST. art. I, § 17; *Gen. Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 598 (Tex. 2001).

■ To recover compensation for inverse condemnation under Article I, Sec-

---

2. *See* Tex. Prop.Code Ann. §§ 21.001–.024 (Vernon 2004 & Supp.2009), 21.041–.065 (Vernon 2000 & Supp.2009).

3. *See* U.S. CONST amend. V.

tion 17, a claimant must plead and prove (1) an intentional governmental act; (2) resulted in a "taking" of his property; (3) for public use.[4] See Little–Tex, 39 S.W.3d at 598; Park v. City of San Antonio, 230 S.W.3d 860, 867 (Tex.App.-El Paso 2007, pet. denied). Here, the parties' dispute focuses only on the second prong of this test,[5] that is, the proof necessary to establish a "taking" of property by airplane overflights.

Actually, the scope of their disagreement as to the appropriate legal test is quite narrow. Both cite City of Austin v. Travis County Landfill Co., 73 S.W.3d 234 (Tex.2002) ("TCLC") as controlling authority. In addition, the parties agree that, under TCLC, "to establish a taking by aircraft overflights, a landowner must show that the flights directly, immediately, and substantially interfere with the land's use and enjoyment." Id. at 240. However, the City contends the homeowners must also show the overflights have rendered their homes uninhabitable—that is, unusable for their intended purpose—to prove a constitutional "taking" of property. Appellants disagree.

Whether particular facts give rise to a "taking" of property is a question of law we review de novo.[6] See id. at 241; Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 937 (Tex.1998). In deciding whether a "taking" has occurred, we may consult federal cases interpreting comparable language in the Fifth Amendment to the United States Constitution. See Sheffield Dev. Co. v. City of Glenn Heights, 140 S.W.3d 660, 669 (Tex.2004); Mack, 312 S.W.3d 855, ——. We begin, then, with authority from the United States Supreme Court.

### B. Taking by Overflight

The seminal case in the area of overflight-takings jurisprudence is United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). There, the United States Supreme Court addressed the question of whether property could be considered "taken," under the Fifth Amendment, by the frequent and low-altitude passage of military aircraft above the owner's land. See id. at 258, 66 S.Ct. 1062. The owners had operated a chicken ranch

---

4. This same test also applies to the homeowners' claims for intentional nuisance. See City of Dallas v. Jennings, 142 S.W.3d 310, 315–16 (Tex.2004) ("[A] city may be held liable for a nuisance that rises to the level of a constitutional taking.") (emphasis added) (citing City of Abilene v. Downs, 367 S.W.2d 153, 159 (Tex.1963)).

5. In its motion for summary judgment, the City did not challenge the homeowners' proof as to the first and third elements of the constitutional-takings test.

6. At least one court has observed that constitutional-takings analysis is not particularly user-friendly. See Md. Port Admin. v. QC Corp., 310 Md. 379, 529 A.2d 829, 833 (1987) ("To date courts have not developed a test which can be comprehensively and consistently applied to determine whether a government has taken property."). Often, the deter-

mination depends heavily upon the unique facts of each case. See Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1212 (Fed.Cir.2005).

In this case, the City suggests average noise levels could be used as an objective barometer of whether residential property has been rendered uninhabitable by overflights. That approach would seemingly appeal to those seeking a more predictable, quantifiable test in this context. However, the test might be considered underinclusive of some unacceptable living situations to the extent it may not account for temporary "spikes" of deafening noise that could render a house uninhabitable even though the average decibel level falls within an acceptable threshold. In this case, for example, one resident testified, "[T]he [noise-level] rating ... averages events over a 24–hour period ... when in fact numerous events that are in excess of 90 decibels can occur and really disrupt your life."

on the property but were forced to give up their business because of the noise generated by heavy military planes flying only sixty-three feet above the barn:

> [Aircraft] come close enough at times to appear barely to miss the tops of the trees and at times so close to the tops of the trees as to blow the old leaves off. The noise is startling. . . . As a result of the noise, respondents had to give up their chicken business. As many as six to ten of their chickens were killed in one day by flying into the walls from fright. The total chickens lost in that manner was about 150. Production also fell off. The result was the *destruction of the use of the property as a commercial chicken farm.*

*Id.* at 259, 66 S.Ct. 1062 (emphasis added). In addition, the Court observed that the owners, who also lived on the property, were frequently unable to sleep and had become nervous and frightened. *See id.*

The Court found those facts *sufficient* to establish a Fifth Amendment taking but declined to define the outer boundary of proof *necessary* to show a taking by overflight:

> The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land. We need not speculate on that phase of the present case.

*Id.* at 266–67, 66 S.Ct. 1062. Notably, the Court suggested a compensable taking would occur if overflights limited the utility of the land, as by rendering residential property uninhabitable. *See id.* at 261–62, 66 S.Ct. 1062. However, the Court did not directly indicate whether such a showing was necessary.[7]

The topic of "unusability" was again mentioned, but not expressly described as essential to a "takings" claim, in the subsequent case of *Griggs v. County of Allegheny, Pennsylvania,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). As with the chicken ranch in *Causby,*[8] the *Griggs* Court concluded a "taking" had occurred because frequent low-altitude overflights rendered the affected property unusable as a residence. *See id.* at 87, 89, 82 S.Ct. 531. Specifically, the flights made conversation and sleep impossible, rattled house windows and caused plaster to fall, and impaired the occupants' health. *See id.* at 87, 82 S.Ct. 531. In addition, the house was located so near the runways that, in the event of aircraft engine failure, the pilot "would have no course but to plow into [the] house." *Id.*

Five years later, this Court cited *Griggs* in affirming an inverse-condemnation judgment in favor of a property owner whose

---

7. In their brief, appellants contend the Court expressly rejected an uninhabitability requirement in *Causby.* We disagree; the Court held only that an owner need not prove his property has been completely destroyed and unusable for *all* purposes in order to recover compensation for a taking. *See Causby,* 328 U.S. at 262, 66 S.Ct. 1062. Stated differently, under *Causby,* the government may not avoid an otherwise valid takings claim simply by, for example, arguing residential purpose could be repurposed for industrial use. *See id.*

8. In *Griggs,* the Court summarized its previous holding in *Causby* as follows: "[*Causby*] held that the United States by low flights of its military planes over a chicken farm made the property *unusable for that purpose* and that *therefore* there had been a 'taking', in the constitutional sense, of an air easement for which compensation must be made." *Griggs,* 369 U.S. at 88, 82 S.Ct. 531 (emphases added).

residence had become uninhabitable because of overflights. *See City of Houston v. McFadden*, 420 S.W.2d 811, 816 (Tex. Civ.App.-Houston [14th Dist.] 1967, writ ref'd n.r.e.). In that case, airplanes flew as low as eighty feet above the house, leading to broken windows, cracks in the wall, and deafening noise levels of up to 109 decibels. *See id.* at 813. Because the Federal Housing Administration deemed noise levels of 100 decibels "unacceptable for residential use," it refused to insure the plaintiff's mortgage. *See id.* at 814, 816. Thus, it was determined that the property could not be used as a residence, and was instead better suited for industrial use. *See id.* at 814.

However, *McFadden*, like *Causby* and *Griggs*, does not squarely address the issue presented here. Those courts determined only that proof of uninhabitability can be *sufficient* to establish a taking of residential property. *See Causby*, 328 U.S. at 261–62, 66 S.Ct. 1062; *Griggs*, 369 U.S. at 87, 89, 82 S.Ct. 531; *McFadden*, 420 S.W.2d at 813–14. They did not, however, expressly describe such evidence as *necessary* to a valid inverse-condemnation claim.

Nevertheless, the Texas Supreme Court added that evidentiary requirement in 2002, when it decided *TCLC*. There, the plaintiff owned property, which it intended to operate as a landfill, roughly one-half mile away from the main runway at Austin–Bergstrom International Airport. *See TCLC*, 73 S.W.3d at 237. In 1997, however, the airport begin accepting civilian air traffic, prompting TCLC to sue the City of Austin for an alleged taking-by-overflight under Article I, Section 17 of the Texas

Constitution. *See id.* The jury found a compensable taking and awarded damages, but the Texas Supreme Court granted the City of Austin's petition for review "to decide whether TCLC established that the civilian overflights ... constituted a taking under the Texas Constitution." *Id.* at 238.

The parties apparently assumed, as they do here, that Texas follows the federal taking-by-overflight standard. *See id.* at 239. Therefore, the Court analyzed the validity of TCLC's claim under *Causby*, without specifically addressing whether the Texas Constitution affords the same level of protection from overflight effects. *See id.* After reviewing *Causby*, *Griggs*, and *McFadden*, as well as authority from other jurisdictions, the Court recited the applicable legal standard as follows:

> [T]o establish a taking by aircraft overflights, a landowner must show that the flights directly, immediately, and substantially interfere with the land's use and enjoyment. *To meet this standard, the landowner must show* that the overflight effects directly and immediately impact the land *so that the property is no longer usable for its intended purpose.*

*Id.* at 240 (emphases added). Thus, although not explicitly stated in *Causby* and *Griggs*, the Court expressly interpreted those cases as *requiring* the landowner to prove his property unusable for its intended purpose to establish a compensable taking. *See id.*[9]

The insertion of an "unusability" requirement in *TCLC* was neither careless nor inadvertent; instead, similar language

---

9. *But see Hillsborough County Aviation Auth. v. Benitez*, 200 So.2d 194, 198–99 (Fla.Dist.Ct. App.1967) (finding residential property was "taken" under the Florida Constitution even though overflights did not render houses uninhabitable), *cited in TCLC*, 73 S.W.3d at 240.

In *Benitez*, however, the plaintiffs also demonstrated, unlike here, that the overflights were actually weakening the structural integrity of their homes, raising a question as to their continued habitability. *See id.* at 196, 199.

appears at least eight other times in the Court's opinion:

- "To establish a taking by aircraft overflights, a landowner must show ... that the property was unusable for its intended purpose." *Id.* at 237.
- "[T]o rise to the level of a constitutional taking, the overflight-related effects must directly, immediately, and substantially impact the property's surface so that it is no longer usable for its intended purpose." *Id.* at 240.
- "None of [TCLC's evidence shows] immediate, direct and substantial overflight effects that rendered TCLC's property unusable for its intended purpose." *Id.* at 241.
- "TCLC does not even allege that overflight effects ... impacted the use and enjoyment of its property *as a landfill*." *Id.* at 242 (emphasis added).
- "[T]o establish a taking claim, TCLC must show that the civilian overflights ... interfered with the property's use *as a landfill*." *Id.* at 243 (emphasis added).
- "Here, however, TCLC presented no evidence that the addition of civilian overflights caused overflight effects that interfered with the use of TCLC's property *as a landfill*." *Id.* (emphasis added).
- "[T]he testimony fails to ... establish that those risks interfered with the property's *use as a landfill*." *Id.* (emphasis added).
- "[B]ecause before and after the alleged taking TCLC was authorized to operate a Type IV landfill—*the property's intended use*—there is no evidence that the overflights rendered the property *unusable for its intended purpose*." *Id.* at 244 (emphases added).

Further, the Court's disposition of the case hinged upon the evidence—or lack thereof—of usability. Ultimately, the Court determined TCLC had not proven its property unusable as a landfill, concluded no "taking" had occurred, and therefore reversed and rendered judgment in the City's favor:

> To establish a taking of private property by aircraft overflights in this case the landowner had to show that the overflight effects directly, immediately, and substantially impacted the land so that the property was unusable for its intended purpose. TCLC presented no such evidence.... [T]he evidence does not establish a taking[.]

*Id.*

We do not divine from *Causby* and *Griggs* any overt requirement that the landowner prove his property unusable for its intended purpose; the Texas Supreme Court, however, does. Whether we agree with *TCLC* is of no moment because, as an intermediate court of appeals, we are obligated to follow established precedent from the Texas Supreme Court. *See Lubbock County, Tex. v. Trammel's Lubbock Bail Bonds,* 80 S.W.3d 580, 585 (Tex.2002); *Lundstrom v. United Servs. Auto. Ass'n–CIC,* 192 S.W.3d 78, 94 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). In this case, then, we hold that, to demonstrate a compensable taking-by-overflight under current Texas law, the homeowners were required to prove the overflights directly, immediately, and substantially impacted the land so as to render their property unusable for its intended purpose as a residence. *See TCLC,* 73 S.W.3d at 244.

### C. Application to Facts

Applying that stringent standard to the summary-judgment evidence contained in the record, we must conclude the homeowners have not stated a viable "takings"

claim. In their brief, appellants do not contend their houses have been rendered uninhabitable.[10] Instead, they fairly summarize their complaints, which are described more fully in over 900 pages of deposition testimony in the record, as follows: "Plaintiffs have testified that conversations were impossible, television reception was disturbed, sleep was interrupted, children and pets were frightened or became nervous or irritable, and it was difficult to entertain company or to conduct telephone conversations."

None of the homeowners testified they cannot live in their homes because of the overflights. To the contrary, some residents either flatly refused to move or confirmed they can still "lead normal lives" despite the increased noise levels. In addition, the record does not suggest that houses in the neighborhood have been abandoned or lie vacant. Instead, residents seeking to leave the subdivision, for whatever reason, apparently have been able to find ready purchasers for their property since the construction of the new runway in 2003. Moreover, the record contains evidence that roughly half of the houses have *increased* in value since 2003.

The homeowners uniformly testified the increase in overflights has made their neighborhood a less desirable place to live. Under *TCLC*, however, that evidence does not rise to the level of a compensable "taking" under Article I, Section 17. *See*

*TCLC*, 73 S.W.3d at 244; *see also Genter v. Blair County Convention & Sports Facilities Auth.*, 805 A.2d 51, 56 (Pa. Commw.Ct.2002) (" 'Merely having a house that is somewhat less desirable to live in does not constitute the type of exception circumstance needed to prove a *de facto* taking of an entire residential property.' ") (citation omitted).

We hold that, under current Texas law, appellants have not presented evidence raising a genuine fact issue as to a "taking" of their property. Therefore, the trial court did not err by granting the City's motion for summary judgment, and we overrule their first issue on appeal. Having done so, we need not address their remaining challenges to the trial court's judgment. *See* Tex. R.App. 47.1; *W. Invs., Inc.*, 162 S.W.3d at 550 (requiring courts to affirm summary judgment if any stated ground is found to be meritorious). Accordingly, we must affirm the judgment.

## III.

### Conclusion

We are not unsympathetic to the frustration the homeowners have experienced as a result of the increased noise levels in their neighborhood. Several residents testified to such problems as increased irritability and stress caused by a disruption in their normal sleep habits, and embarrassment in trying—often unsuccessfully—to

---

10. We are not aware of any objective test for habitability in this "takings" context. Under the landlord-tenant framework, for example, the Texas Legislature has recognized that premises may be rendered uninhabitable by a "condition [that] materially affects the physical health or safety of an ordinary tenant." Tex. Prop.Code Ann. §§ 92.052(a)(3), 92.056(b)(2) (Vernon 2007 & Supp.2009); *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 755 (Tex.1998) (indicating chapter 92 sets out "specific minimum standards of habitability"). Because appellants do not contend their homes are uninhabitable, we need not define the scope of that term here. *See Thompson v. Ricardo*, 269 S.W.3d 100, 103 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (holding appellate courts lack authority to render advisory opinions). However, we note an objective standard for proving a residence has been rendered "unusable for its intended purpose," *see TCLC*, 73 S.W.3d at 244, would add some degree of predictability to a decidedly unclear and fact-bound area of the law.

hold outdoor gatherings for friends and family.

However, these complaints, though certainly not insignificant, do not amount to a constitutional "taking" of their property, under current Texas law, absent a showing by individual homeowners that their houses are no longer usable for residential purposes. *See TCLC*, 73 S.W.3d at 244. Accordingly, we affirm the trial court's judgment.